352 So.2d 479 (1977)
In re Johnny HARRIS
v.
STATE of Alabama.
Ex parte Johnny Harris.
SC 1768.
Supreme Court of Alabama.
September 9, 1977.
Rehearing Denied December 9, 1977.
*480 William H. Allison, Jr., Louisville, Ky., and W. Clinton Brown of Crawford, Blacksher, Figures & Brown, Mobile, for petitioner.
William J. Baxley, Atty. Gen., Eric A. Bowen, G. Daniel Evans and James S. Ward, Asst. Attys. Gen., for the State.
EMBRY, Justice.
Johnny Harris was convicted of first degree murder for killing Wheeler Barrow, a prison guard. At the time the offense was committed, Harris was an inmate at the Atmore prison serving five life-term sentences. He appeals the judgment of the trial court imposing the death penalty, fixed by jury verdict and made mandatory by statute. Tit. 14, § 319, Code. On appeal to the Court of Criminal Appeals, the judgment was affirmed. Harris v. State of Alabama, Ala.Cr.App., 352 So.2d 460 (1976). We granted certiorari, as a matter of right, to review that decision. Rule 39(c), ARAP.
The issue which we address in this opinion is whether mandatory imposition of the death penalty upon a life-termer who commits first degree murder constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the Constitution of the United States and in violation of Section Fifteen of the Alabama Constitution of 1901.
Title 14, § 319, brought forward in our Code since 1886, provides:
"Any convict sentenced to imprisonment for life, who commits murder in the first degree, while such sentence remains in force against him, shall, on conviction, suffer death."
Petitioner challenges the constitutionality of the mandatory death penalty provision of this statute.
*481 We hold it constitutional, constitutionally applied in this case, and affirm the Court of Criminal Appeals.

I
On January 18, 1974, a riot erupted in the maximum security unit of Atmore prison at a time evening meals were being distributed. The warden, when informed of the riot, gave instructions on measures to be taken to subdue the rioting prisoners. Meanwhile, prison guards Barrow and Arthur Dreadin, distributing meals, were taken hostages by Harris and another prisoner, Oscar Johnson. Harris and Johnson took the guards' keys, money, and watches, and proceeded with them to cell number one. There they released all of the inmates from their cells. During the course of these events, Harris said, "We are going to kill some pigs today."
After the inmates were released by Harris and Johnson, they along with the released inmates, took Barrow and Dreadin to the unit's lobby, and tied their hands behind them. The guards were then taken back to cell one by Harris and Johnson where guard Dreadin was hit with a knife by an inmate named Moore. Another inmate struck Barrow, who gave an awful groan. Harris said to Dreadin, "I'm going to kill you; I'm going to roll your head down the hall with the rest of these pigs." Another inmate yelled to get the revolution on, while another said, "Bring me one of those ______ ______pigs." At this time Dreadin called to the warden to come in.
The warden ordered his men to go into the unit, and upon entering saw two inmates stab Dreadin. Shotguns were fired into the floor; inmates scattered and Barrow was found dead in Harris' and Johnson's cell, with his feet bound and hands tied behind him. He had been stabbed 27 times and had his head bashed in. An autopsy revealed the cause of death to be a deep 14-inch penetrating wound that passed through the liver, left lung, and diaphragm, and the heart had been severed. Harris, testifying in his own behalf, said he was serving a life sentence for rape, and 4 life sentences for armed robbery. He said he participated in the revolt and riot because he feared for his life. He denied stabbing the guard.

II
The defendant says that death sentences imposed under Tit. 14, § 319, Code, must be invalidated because they violate the Eighth and Fourteenth Amendments to the Constitution of the United States and Section Fifteen of the Constitution of Alabama. He argues six reasons for this being true:
1. Contemporary society has repudiated the death penalty because of its peculiar harshness.
2. No matter how narrow the category of capital homicide may be, invalid mandatory death-sentencing procedures are not validated.
3. The Alabama statute affords no opportunity for the constitutionally required particularized consideration of relevant aspects of the character and record of each convicted defendant before the imposition upon him of a sentence of death.
4. The Eighth Amendment requires that both aggravating and mitigating factors be considered by the sentencing authority in determining whether a death sentence is appropriate.
5. Alabama's statute will permit the mechanical imposition of death sentences in a number of cases where contemporary community standards would not otherwise allow condemning the particular defendant.
6. Section 319 does not provide a constitutionally permissible alternative to the unconstitutionally arbitrary and capricious jury discretion to choose a verdict for a lesser offense when it feels the death penalty is inappropriate.
We disagree.

III

A.
The punishment of death does not invariably violate the Constitution of the United States. Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). *482 We here hold that neither does the death punishment nor the imposition of it under Section 319 violate the Constitution of Alabama. Bailey v. State, 211 Ala. 667, 101 So. 546 (1924).

B.
It is argued that Section 319 does not provide for individualized sentencing after review of the character and record of the particular defendant and after examination of the circumstances of the particular case. This is premised on the alleged similarity, in all significant respects, of Section 319 to the laws of North Carolina, Louisiana, and Oklahoma, struck down by the Supreme Court in Woodson v. North Carolina, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); Stanislaus Roberts v. Louisiana, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976); Harry Roberts v. Louisiana, 431 U.S. 633, 97 S.Ct. 1993, 52 L.Ed.2d 637 (1977), and Williams v. Oklahoma, 428 U.S. 907, 96 S.Ct. 3218, 49 L.Ed.2d 1215 (1976).
The North Carolina statute provided:
"A murder which shall be perpetrated by means of poison, lying in wait, imprisonment, starving, torture, or by any other kind of willful, deliberate and premeditated killing, or which shall be committed in the perpetration or attempt to perpetrate any arson, rape, robbery, kidnapping, burglary or other felony, shall be deemed to be murder in the first degree and shall be punished with death. All other kinds of murder shall be deemed murder in the second degree, and shall be punished by imprisonment for a term of not less than two years nor more than life imprisonment in the State's prison." N.C.Gen.Stat. § 14-17 (Cum.Supp.1975).
The Louisiana statute provided:
"First degree murder.
"First degree murder is the killing of a human being:
"(1) When the offender has a specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of aggravated kidnapping, aggravated rape or armed robbery; or
"(2) When the offender has a specific intent to kill, or to inflict great bodily harm upon, a fireman or a peace officer who was engaged in the performance of his lawful duties * * *" and
"Whoever commits the crime of first degree murder shall be punished by death." LSA-R.S. 14:30
The Oklahoma law provided that every person convicted of murder in the first degree should suffer death and defined first degree murder as a homicide designed to effect the death of the person killed or any other human being:
"2. When perpetrated by one committing or attempting to commit rape, kidnapping for the purpose of extortion, arson in the first degree, armed robbery or when the death occurs following the sexual molestation of a child under the age of sixteen (16) years;" 21 O.S.Supp.1974 § 701.1
Note that each of the offending statutes provides the mandatory death penalty for commission of first degree murder which each statute proceeds to define in terms of the manner by which it is perpetrated, related circumstances when it is committed or, to a limited extent, the character of the offender. We further note that neither in Woodson, Stanislaus Roberts, Harry Roberts, nor Williams was the defendant a life-termer convicted of first degree murder, otherwise defined, while under such a sentence. It is significant that in Woodson, Stanislaus Roberts, Harry Roberts and Gregg, supra, the court made these comments:
"This case does not involve a mandatory death penalty statute limited to an extremely narrow category of homicide, such as murder by a prisoner serving a life sentence, defined in large part in terms of the character or record of the offender. We thus express no opinion regarding the constitutionality of such a statute. * * *" Woodson, supra, footnote 7.
"* * * We have no occasion in this case to examine the constitutionality of *483 mandatory death sentence statutes applicable to prisoners serving life sentences."Woodson, supra, footnote 25.
"Only the third category of the Louisiana first-degree murder statute, covering intentional killing by a person serving a life sentence or by a person previously convicted of an unrelated murder, defines the capital crime at least in significant part in terms of the character or record of the individual offender. Although even this narrow category does not permit the jury to consider possible mitigating factors, a prisoner serving a life sentence presents a unique problem that may justify such a law * * *" Stanislaus Roberts, supra, footnote 9.
"* * * there are some categories of murder, such as murder by a life prisoner, where other sanctions [than death] may not be adequate." Gregg, supra.
"We reserve again the question whether or in what circumstances mandatory death sentence statutes may be constitutionally applied to prisoners serving life sentences." Harry Roberts, supra, footnote 5.
At the time of the indictment of defendant the offense of first degree murder was defined in Tit. 14, § 314, Code:
"§ 314. Degrees of murder.Every homicide, perpetrated by poison, lying in wait, or any other kind of wilful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or the attempt to perpetrate, any arson, rape, robbery, or burglary, or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed; or perpetrated by any act greatly dangerous to the lives of others, and evidencing a depraved mind regardless of human life, although without any preconceived purpose to deprive any particular person of life, is murder in the first degree; and every other homicide, committed under such circumstances as would have constituted murder at common law, is murder in the second degree."
It is clear then that Section 319 is a sentencing statute. Before fixing the mandated punishment under the statute, the jury, the sentencing authority, is informed that the defendant has a bad record and character: he is a convicted felon under a life-term sentence. The jury is likewise informed by the indictment; formal parts omitted:
"The grand jury of said County charge that before the finding of this indictment Johnny Harris, alias John Harris, whose true name is to the Grand Jury otherwise unknown, a convict, having been sentenced to imprisonment in the penitentiary of the State of Alabama for the term of his natural life, by the Circuit Court of Jefferson County, Alabama, while such sentence remained in full force against him, and while he was serving under said life sentence did commit murder in the first degree in this; that the said Johnny Harris, alias John Harris, did unlawfully and with malice aforethought kill Luell Wheeler Barrow by stabbing or cutting him with a knife or a knife-like instrument, a further description of which being otherwise unknown to the Grand Jury; against the peace and dignity of The State of Alabama."
However, the aggravating circumstances must then be found to exist before the sentence may be imposed by the jury: proof must show beyond a reasonable doubt that defendant is guilty of first degree murder and he was under a life-term sentence.
In Woodson (quoting from H. Bedau, The Death Penalty in America, rev. ed. 1967), it was remarked that statutes similar to Section 319 allow the sentencing authority to examine the character and record of the individual offender under terms of definition of the offense for which he must suffer the ultimate punishment. Capital punishment is an extreme sanction suitable only to the most extreme of crimes. We must recognize that there is no additional significant punishment which can be imposed upon a life-termer other than death or removing the possibility of parole. Regarding *484 the latter, if, as many think, capital punishment is a deterrent to commission of crime of murder then it could hardly be argued that lack of possibility of parole would be a deterrent. If, indeed, capital punishment can have a deterrent effect it must be in the circumstances with which the statute deals.
We do not deem it constitutionally required that the sentencing authority consider mitigating circumstances as a condition to imposing the death penalty under Section 319. However, in this case such factors were before the jury, the sentencing authority. Under defenses available to defendant by his plea of not guilty the trial court instructed the jury that it might, under the evidence, return verdicts either of second degree murder, voluntary, or involuntary manslaughter as well as first degree murder. Thus the jury, if not satisfied beyond a reasonable doubt of defendant's guilt as to first degree murder, necessarily had to consider mitigating factors before imposing the death penalty: lack of premeditation; unwilling participation in the event from which arose the death of Barrow; coercion of defendant to act as he was shown to be acting on the occasion; acting from provocation or in the heat of passion, or recklessly or negligently.
Therefore, we hold that Section 319 is sufficiently narrow in defining the offense and the category of offenders to which it applies that mandatory imposition of the death penalty under it is constitutionally permissible.
The statute sufficiently defines the offense in terms of the character and record of the offender to meet any constitutional objections that it does not permit individualized sentencing.
Mitigating circumstances are not required to be considered under Section 319 although, in fact, they were in this case.
An aggravating circumstance is implicit in the statute and necessarily is considered by the jury when fixing punishment. Woodson, Stanislaus Roberts, and Gregg, supra; Jurek v. Texas, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); McGautha v. California, 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971).

C.
The Supreme Court of The United States has recognized the unique nature of statutes providing for the mandatory death penalty for life-term prisoners found guilty of murder and has been explicit in noting that it did not intend to pass on the validity of such statutes when addressing those statutes of a different nature which were before the court in Gregg, Woodson, Stanislaus Roberts, and Harry Roberts.
Quite simply, sentencing statutes of the nature of Section 319 are unique for they fulfill an otherwise unfulfillable public need: assurance that an otherwise unpunishable life-termer who commits a heinous crime of first degree murder shall not go unpunished. In this respect these statutes differ fundamentally from other statutes which provide the mandatory death penalty for specific crimes. The latter category has undergone changes in every state to meet evolving contemporary standards of decency.
The statutes struck down, that permitted imposition of the death penalty, were invalidated on the basis they were either torturous, or out of proportion to the enormity of the offense, or were freakishly, or capriciously and arbitrarily imposed. Weems v. United States, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910); Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). In Stanislaus Roberts and Woodson the court found that contemporary standards of decency applied through the Eighth Amendment forbade imposition of a mandatory death penalty where no discretion was vested in the sentencing authority to impose an individualized sentence: punishment should be imposed according to the nature of the offense and character of the offender; allowing the sentencer to determine the extent of punishment appropriate to the circumstances of the particular case.
Section 319 takes cognizance that a life-termer committing first degree murder can be punished by no other means than forfeiture *485 of his or her life. Old as it may be, Section 319 applies a penalty that is acceptable to contemporary social standards and comports with contemporary concepts of the dignity of man. Likewise it does not impose a punishment disproportionate to the crime. Contemporary social standards, seemingly, do not find acceptable an imposition of the ultimate punishment unless there is no alternative. Put simply, is continued incarceration an alternative when one is already incarcerated, serving five life-term sentences, in punitive segregation, in a maximum security prison and there commits murder in the first degree? We think not. Does death by electrocution for such an offender accord the dignity to man which society requires? We think so. Executed privately, afforded priest, rabbi or minister, escorted solemnly to meet his or her maker, is certainly as dignified and humane way as possible to accomplish the demands of society in those circumstances, as here, where life must be forfeited as retribution for, and in deterrence of, the wanton, brutish taking of the life of another. Nothing else could be proportionate to the offense committed by an offender of the character defined in the statute. Section 319, for the reasons enunciated, does not permit a variety of possible offenders, of a variety of character, under diverse circumstances, to be subject to the freakish, or arbitrary and capricious infliction of death by electrocution.
Nor do we think our appellate review role, in reviewing the death sentence mandated for life-termers, is "subjective and unpredictable," as was charged in Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976).
In the first place, our appellate review system mandates that the Court of Criminal Appeals review all death cases. Its review includes a "search the record" rule which requires that court to search the record for error regardless of whether the error was raised on appeal or not. Tit. 13, § 111(2), Code. Thereafter, further appellate review by way of writ of certiorari is automatic in this court. Rule 39(c) ARAP.
This court, in consultation en banc, has carefully considered the transcript of the evidence in this case, the facts constituting the murder, its heinous and unprovoked character, the circumstances existing at the time, the defenses offered by defendant, his character and propensities as indicated by his prior offenses, and has concluded that imposition of the death penalty in this case is neither arbitrary nor capricious.
We therefore hold that to subject a life-term prisoner to a mandatory death sentence when convicted of first degree murder, under the constitutions, is permissible; Federal and State. The judgment of guilty and the sentence of death is affirmed.
AFFIRMED.
BLOODWORTH, FAULKNER and ALMON, JJ., concur.
MADDOX, J., concurs specially.
TORBERT, C. J., and JONES, SHORES and BEATTY, JJ., dissent.
MADDOX, Justice (concurring specially).
I concur in that aspect of the opinion which affirms Harris' conviction, but I concur in the result only in that aspect of the opinion which affirms the sentence of death.
Harris' attack on the statute's constitutionality is not essentially different from previous attacks, each of which has been considered and denied by this Court. See Bailey v. State, 211 Ala. 667, 101 So. 546 (1924), wherein this Court specifically held:
". . . This statute [Present Title 14, Section 319] is not offensive to any clause of the state or federal Constitutions . . . ." (Emphasis added)
The only question is whether the statute might now be offensive to the federal constitution because of some recent interpretations of the Supreme Court of the United States on the question of cruel and unusual punishment. The Supreme Court of the United States has not ruled on the constitutionality of a statute like the one here. As a matter of fact, that Court has specifically *486 reserved the question whether or in what circumstances mandatory death sentence statutes may be constitutionally applied to prisoners serving life sentences. See footnote 5, Roberts v. Louisiana, 431 U.S. 633, 97 S.Ct. 1993, 52 L.Ed.2d 637 (1977).
Even though the Supreme Court of the United States has not decided the constitutionality of statutes such as Title 14, Section 319, I believe that Court, when and if presented with the question, will agree with that portion of the plurality opinion which states that the sentencing authority need not consider mitigating circumstances as a condition to imposing a death penalty under Section 319. Assuming, however, that the plurality opinion is incorrect, and that a prisoner serving a life sentence is entitled to show mitigating circumstances to the sentencing authority prior to being sentenced, I find no error here because when Harris was specifically asked by the sentencing authority[1] if he had anything to say why the sentence should not be imposed, he answered, "No."[2]
Even assuming Harris did not waive his right to present mitigating circumstances, as I view the matter, the most relief he would be entitled to under any circumstances would be a remand of the cause to the trial judge in order to allow him to present mitigating circumstances to the judge as the sentencing authority. This procedure would comport with the current scheme for trial and sentencing in Alabama, post-Furman. See Act No. 213, Acts of Alabama, 1975, p. 701 and Act No. 607, Regular Session, 1977, which will become effective on May 16, 1978.
TORBERT, Chief Justice (dissenting):
This Court, when reviewing a case involving the imposition of the death penalty, must insure that the defendant has not been sentenced in an arbitrary or capricious manner. When the sentence of death has been imposed pursuant to a statute mandating such a sentence, we must satisfy ourselves that the procedures employed within the statute allow the consideration of "the particularized nature of the crime and the particularized characteristics of the individual defendant" by the sentencing authority. Gregg v. Georgia, 428 U.S. 153, 206, 96 S.Ct. 2909, 2941, 49 L.Ed.2d 859 (1976). After a careful examination of the facts in this case and of the procedures employed under Ala.Code tit. 14, § 319 (1958), I find that the imposition of the death penalty under this statute violates the eighth and fourteenth amendments to the United States Constitution, and I hereby dissent from the majority's affirmance of the sentence of death.
The defendant, Johnny Harris, was convicted under a statute which calls for the mandatory imposition of the death penalty when a life-term convict commits first degree murder. Ala.Code tit. 14, § 319 (1958). *487 The majority purports to patch up the procedural deficiencies present in this statute by stressing certain compelling considerations of policy; however, it is clear that these policy matters do not rectify the constitutional infirmities which permeate section 319.
The majority feels that, in situations covered by section 319 (murder by a life-termer), other sanctions besides the death penalty are not adequate. They feel that a life-term convict should not be immune from further punishment when he commits first degree murder. I totally agree that a defendant convicted of first degree murder should be punished. However, the issue in this case does not revolve around the defendant's immunity to further punishment; rather, the question is whether the defendant's actions, after a complete examination of his character and record and the circumstances surrounding the crime, merit the imposition of capital punishment.
The majority holds, in effect, that murder by a life-termer is such an aggravated offense that no combination of mitigating factors could overcome the aggravating factor. They also emphasize the narrow application of the statute to sustain its validity. Granted, section 319 only applies to life-term convicts, but, solely because the murder was committed by a life-termer, all consideration of mitigating factors cannot be constitutionally foreclosed through the mandatory imposition of the death penalty.
The United States Supreme Court has stated in a plurality opinion that a capital sentencing procedure, to pass constitutional muster, should "focus the jury's attention on the particularized nature of the crime and the particularized characteristics of the individual defendant." Gregg v. Georgia, 428 U.S. 153, 206, 96 S.Ct. 2909, 2941, 49 L.Ed.2d 859 (1976). Section 319 is thus invalid, for it fails to guide and focus the jury's determination of whether the defendant should receive the death penalty. It goes no further than to guide the jury's determination of guilt or innocence; the statute mandates the penalty.
The majority holds that section 319 "sufficiently defines the offense in terms of the character and record of the offender to meet any constitutional objections that it does not permit individualized sentencing." They also hold that mitigating circumstances are not required to be considered under section 319 to uphold its validity, even though they were considered by the jury in this case, and that an aggravating circumstance is implicit in the statute.
I agree that under section 319 the jury must find the existence of an aggravating circumstance before returning a verdict of guilty: that the defendant is a convicted felon serving under a life sentence. However, I disagree that this single factor is so severe that no mitigating factors or combination thereof could overcome it. The majority claims that the statute is defined in terms of the character and record of the accused, thereby dispensing with the need to consider mitigating factors. However, section 319 only speaks in terms of the defendant's bad character and record. He is not allowed to have evidence considered by the jury which would move against the imposition of capital punishment. Therefore, how can the jury competently decide whether the accused deserves the ultimate penalty?
The eighth amendment requires the sentencing authority in a capital case to not only inquire as to why capital punishment should be imposed, but also as to why it should not be imposed. Jurek v. Texas, 428 U.S. 262, 271, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). Thus, while the mitigating factors need not be statutorily defined, they must in fact be considered by the sentencing authority. Id. The majority states that mitigating circumstances need not be considered in this case. However in Roberts v. Louisiana, 431 U.S. 633, 97 S.Ct. 1993, 52 L.Ed.2d 637 (1977), the Supreme Court intimated that it felt otherwise in a case involving a narrowly-defined mandatory death penalty statute for the killing of a police officer:
"To be sure, the fact that the murder victim was a peace officer performing his regular duties may be regarded as an aggravating circumstance. There is a special interest in affording protection to *488 these public servants who regularly must risk their lives in order to guard the safety of other persons and property. But it is incorrect to suppose that no mitigating circumstances can exist when the victim is a police officer."
Id. at 636, 97 S.Ct. at 1995-96 (footnote omitted). The Court struck down the statute, and even though it expressly reserved any ruling on statutes similar to section 319, at 637, 97 S.Ct. at 1996 n. 5, the varied factual situations possible under the Roberts statute are also present in section 319, and so are the potential mitigating factors.
The majority attempts to salvage section 319 by holding that mitigating factors were in fact put before the jury for its consideration. However, the only reference to "mitigating" factors in the trial court's charge to the jury involved the description of legal defenses to the crime charged: lack of premeditation, acting in response to provocation, etc. No instruction was given to the jury that they could consider mitigating factors such as coercion, unwilling participation, or others in the determination of their verdict. Thus, in actuality mitigating factors had no function in the determination of the sentence. The jury found the defendant guilty and the statute condemned him to death.
The constitutional inadequacy of this procedure is accentuated by the facts in this case. The defendant in this case, though found guilty of first degree murder, presented evidence that his participation in the prison riot was coerced by his fellow inmates. Though this does not constitute a defense for his crime, it is obviously a factor which could mitigate against the death penalty, and therefore should be considered in the sentencing procedure. There being no provision for the sentencing authority to consider this "coercion" factor, section 319 thus fails to satisfy this minimal constitutional requirement.
Since the sentencing procedure is defective under section 319, I must address the issue of what this Court can and must do to correct the sentence handed down below. I do not believe that we can rehabilitate this statute by judicially amending it to provide for discretion in the jurors. Neither can we engraft a bifurcated trial procedure without a mandate from the legislature. Swain v. State, 290 Ala. 123, 274 So.2d 305 (1973). The statute is plain and its meaning is clear: it is a mandatory death sentence statute.
After a thorough review of this case, I feel that the judgment of guilty must be affirmed and that this Court should correct the sentence to one of life imprisonment. In Swain v. State, supra, this Court reduced a sentence from death to life in prison after the United States Supreme Court struck down Alabama's death penalty for rape. That statute gave the jury discretion to enter a sentence of death or imprisonment for not less than ten years. Since the jury had opted for the death penalty, the Court in Swain imposed the maximum noncapital penalty on remand, refusing to send the case back to the jury. The Court felt that it was "reasonable and logical to assume that if the jury . . .had been instructed that the death penalty would be an impermissible punishment, then [it] would have imposed the next most severe penalty". Id. at 124, 274 So.2d at 306.
Section 319 presents a special problem, however, in that it does not provide for any alternative punishment. This issue was readily resolved by the Supreme Court of Louisiana in State v. Williams, 343 So.2d 1026 (La.1977). In that case the court, after reviewing a death sentence imposed under an invalid mandatory death penalty statute, reduced that sentence to one of life imprisonment at hard labor without eligibility for parole for twenty yearsthe most severe penalty for criminal homicide in Louisiana at the time the offense was committed. Id. at 1038; see State v. Melton, 90 N.M. 188, 561 P.2d 461 (1977); State v. Rondeau, 89 N.M. 408, 553 P.2d 688 (1976). This result seems to be applicable to the instant case, because the striking down of section 319 still leaves an alternate penalty for first degree murder in section 318life imprisonment. Ala.Code tit. 14, § 318 (1958).
Section 319 is a sentencing statute. It does not define a substantive offense: section 314 defines the crime of first degree *489 murder. Section 319 merely states that if one who commits first degree murder is a life-termer, then he gets an automatic death sentence. Therefore, it would seem logical that if section 319 were to be struck down, then the general statutory penalty for first degree murder (section 318) should be imposed. See Rockwell v. Superior Court, 18 Cal.3d 420, 134 Cal.Rptr. 650, 556 P.2d 1101 (1976); State v. Rumsey, 267 S.C. 236, 226 S.E.2d 894 (1976). The severance of the death penalty from section 318 left life imprisonment as the only penalty for first degree murder in that provision, Hubbard v. State, 290 Ala. 118, 274 So.2d 298 (1973), and the sentence should be so corrected in this case.
JONES, Justice (dissenting):
I respectfully dissent.
I concur in the dissenting opinion of Ms. Justice Shores, except I would affirm the conviction and reverse and remand for sentencing only.
Between the time the Court of Criminal Appeals' opinion affirming petitioner's conviction and sentence and the date of oral argument before this Court, the Supreme Court of the United States delivered six separate opinions on the constitutionality of death penalty statutes.[1] Convictions for first degree murder with sentences of death were affirmed as a consequence of the Supreme Court's upholding the constitutionality of death penalty statutes in Georgia, Florida, and Texas. The death penalty statutes of North Carolina, Louisiana, and Oklahoma were declared unconstitutional, and the judgment in each of those cases was reversed and remanded as to the sentence of death.

I. The United States Supreme Court Cases

The Supreme Court rejected the death penalty as constitutionally impermissible under those statutes which mandated death as the only sentence upon a finding of first degree murder. Conversely, the Supreme Court upheld as constitutional those statutes which (1) left discretionary with the sentencing authority the imposition of life imprisonment or death, and (2) provided the sentencing authority with standards for the exercise of that discretion. The variances in these state statutessome provide for mandatory death sentences while others provide standards for the guidance of the sentencing authority's discretionunquestionably arose from the diverse interpretations of the Supreme Court's multi-opinioned decision in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).
Some read Furman's constitutional proscription against the death penalty as being grounded solely on the sentencing authority's discretion; and the consequential reaction was to abolish the discretion and make the death penalty mandatory for specified crimes. Others read Furman as proscribing unbridled discretion; and the reaction here was to retain the discretionary sentencing feature of the old statute and add guidelines to ensure imposition of the sentence consistent with "contemporary standards of decency" to meet the "cruel and unusual" test of the Eighth Amendment. Those state legislatures which attempted to comport with Furman by simply severing the discretionary feature of their statute misread Furman. Indeed, their revised mandatory death statutes took on the additional constitutional defect of dehumanizing the convicted individual by mandating, as a matter of law, that every person convicted of a specified crime is equated with every other person so convicted for the purposes of punishment.
These six (now seven) recent United States Supreme Court cases, though each decision is by plurality and not by majority *490 opinion, stand for the general proposition that the Eighth Amendment's proscription against cruel and unusual punishment, while not prohibiting the death penalty per se, requires that the sentencing authority, in the exercise of its sentencing discretion, be instructed on the legal criteria for measuring the individual offender and the particular circumstances surrounding the offense. Stated otherwise, the "evolving standards of decency" Eighth Amendment test, respecting the imposition of punishment, requires discretion in the sentencing authority to impose life imprisonment in lieu of death; and that such sentencing discretion must be guided to a consideration of the individual offender and the particular circumstances of the offense. These guidelines for exercise of the sentencing authority's discretion consist of a carefully defined set of criteria for consideration of both aggravating and mitigating circumstances.[2]
This conclusion is founded on the premise that death is a punishment different from all other sanctions in kind as well as degree. Mandatory death sentences treat all persons convicted of a designated offense as members of a faceless undifferentiated massnot as uniquely individual human beingssubject to the blind infliction of the irretrievable penalty of death. The Eighth Amendment requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutional part of the process of imposing the ultimate penalty sanctioned by the State. And this premise rests on the necessity for establishing the highest degree of reliability in the process for determining that death is the appropriate punishment in a particular case.
These latest United States Supreme Court cases may be summarized thusly: The constitutional ills of pre-Furman discretionary death sentence statutes, with its symptomatic, arbitrary, capricious, and freakish infliction of this ultimate and irretrievable penalty, consist in (1) too broad a range of offenses for which the death penalty is permitted, and (2) the untrammeled discretion in the sentencing authority for imposition of the sentence. Once the ill is diagnosed, the curative effect of the post-Furman prescription for restoration of constitutional well-being is likewise dual in its treatment(1) a narrowing of the categories of offenses, and (2) controlled discretion in the sentencing authority's application of established criteria for imposition of the appropriate penalty.

II. Constitution of Alabama as Basis for Decision The United States Supreme Court, with all of its thoroughness in treating these seven death penalty cases, does not answer the constitutional issue in the instant case. Indeed, in at least three separate references, that Court expressly excluded from its consideration the mandatory death penalty for a life termer who commits first degree murder.[3] Thus, this Court's resolution of the dispositive issue here under review must be based on one of two choices:
(1) We must speculate on the United States Supreme Court's interpretation of § 319 in light of the Cruel And Unusual Punishment Clause of the Eighth Amendment to the United States Constitution, or
(2) We must test the validity of petitioner's death sentence against our own organic law.
*491 The temptation to transpose the ultimate responsibility for petitioner's fate from this Court to that of the United States Supreme Court, which is implicit in choice # 1, is almost overwhelming; but three factors, in my opinion, should compel us to resist this temptation and discharge the responsibility which rightfully rests upon this Court under choice # 2:
(1) The Supremacy Clause of the United States Constitution proscribes this Court's interpretation of that document as either exceeding or falling short of the minimum safeguards prescribed through judicial interpretation by our nation's highest tribunal. In other words, while this Court is bound by the United States Supreme Court's pronouncements of our Federal Constitution's minimum guarantees, we are not at liberty to construe our nation's organic law so as to expand or restrict these minimum safeguards contrary to decisional law of our highest Court.[4] It is this legal truism that dictates the use of the phrase, "We must speculate on the United States Supreme Court's interpretation . . . .", under choice # 1, to make an educated guess at the United States Supreme Court's resolution of the issue at bar.
(2) Conversely, this Court is at liberty to resolve this issue so long as our interpretation and application of our own State Constitution equals or exceeds the minimum safeguards prescribed by the United States Constitution, as those guarantees are interpreted and applied by the United States Supreme Court.[5]
(3) The third consideration which, in my opinion, should compel our selection of choice # 2 is perhaps paramount. Petitioner is an Alabama citizen, convicted under an Alabama statute for murder of an Alabama citizen which occurred in Alabama. If his death sentence is now or ultimately affirmed, he will die at the hands of an Alabama instrumentality, the electric chair. If his death sentence is now or ultimately set aside, the taxpayers of Alabama, through their penal institutions, will house, feed, and care for the petitioner for the rest of his life. Petitioner's rights are protected by the Alabama State Constitution, whose "Declaration of Human Rights" is more eloquent in expression and broader in scope than the Bill of Rights of our United States Constitution.[6] It is in this context, then, that I feel we should discharge the responsibility of "washing our own dirty linen."

III. The Decision

My conclusions are first summarized and then the rationale for my dissent follows:
A. The Alabama State Constitution does not prohibit the death penalty per se.
B. Mandatory death sentences are constitutionally impermissible under the requirements of due process of law, which are expressly and inherently guaranteed in the Constitution of Alabama.
C. The mandatory death penalty provision of Tit. 14, § 319, Code, is severable; and a discretionary life imprisonment or death sentence provision should be judicially ingrafted into the statute in order to render the statute in its entirety constitutional.
D. Petitioner's conviction for murder in the first degree should be affirmed, and the case remanded for rehearing before a jury in a bifurcated proceeding (which in this instance would necessarily be before a newly impanelled jury) in which evidence of aggravation and mitigation may be shown as hereinafter discussed.
*492 A. Death Penalty Not Constitutionally Prohibited
Suffice it to say, for the purpose of holding that Alabama's Constitution does not in every case and under all circumstances prohibit the death penalty, I agree with the well-reasoned opinion on this point of Mr. Justice Stewart in Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).
B. Mandatory Death Penalty Prohibited My discussion of this point begins with the recognition that the plurality opinions of the United States Supreme Court grounded their prohibition of mandatory death sentences on the Cruel And Unusual Punishment Clause of the Eighth Amendment.[7] The "evolving standards of decency" formula under the Eighth Amendment is similar to earlier formulas developed under the Due Process Clause of the Fourteenth Amendment. This can be translated to say: A statute fails to meet constitutional standards if, when measured by due process requirements, it violates principles of justice which are fundamentally rooted in the tradition and conscience of our people.
Admittedly, both formulas are subject to the same criticismthat they force the judges to evaluate current standards of decency and principles of justice fundamentally rooted in the traditions and conscience of society rather than being capable of precise definition. But this is neither novel nor peculiar to this area of judicial responsibility. I believe the common law principle of due process of law, which forms an inexorable thread running through, overtly expressed by, and inherent in, the whole of the language and spirit of our State Constitution, requires a differentiating process even in the sentencing of a life-termer who commits first degree murder.[8]
The State argues that the category of crime defined by the statute in question is so narrow that all those who fit its definition (a life termer who commits first degree murder) may be treated alike for purposes of sentencing without doing constitutional violence to due process. I disagree. While a convict serving a life sentence, who commits first degree murder, is a sufficiently narrow category to constitutionally justify the discretionary imposition of the death penalty, the mandatory penalty of death, in my opinion, is nevertheless constitutionally offensive.
It is my opinion that due process requires an individualistic consideration for the purpose of sentencing even among so narrow a category of offenders. And the aim of this requirement is to ensure that the death penalty is inflicted only after the most careful scrutiny by the sentencing authority into the character and record of the person, whose loss of life is to be lawfully sanctioned, and into the totality of the circumstances surrounding the offense.
Given the premise that society can tolerate, among the sanctions of its criminal law system, the irretrievable penalty of death for certain specified offenses, I believe that due process restricts this tolerance to rare and extreme cases with due regard to all possible circumstances bearing upon the offender and the offense. Due process mandates that not even all life termers who commit first degree murder are to be equated, as a matter of law, with all other such persons; that even in this narrow category there is room for differentiation and relative consideration with respect to the appropriate sentence.
Perhaps the single most persuasive argument supportive of the constitutional validity of this statute is the contention that mandatory death is essential for the imposition of any punishment whatsoever for the proscribed offense. That to give a life termer an additional life sentence for so grave a crime as first degree murder *493 amounts to no punishment at all is an argument not to be treated lightly; and I have not so treated it. Nevertheless, I reject the conclusion urged by this argument for two reasons:
(1)Even in face of the dilemma of giving a life termer an additional life sentence, I think the due process requirement for establishing the highest degree of reliability in the sentencing process for the selection of those who will die must prevail. Where there must be a choice between the dilemma of doubling a life sentence,[9] on the one hand, and sacrificing the due process requirements, on the other hand, the choice is not an overly difficult one.
(2)The death penalty may still be imposed under the controlled discretion of the jury, with full disclosure of the offender's character and record. I think the system can ill afford not to trust the jury's exercise of this sentencing discretion as reflecting evolving societal standards of decency and contemporary moral values. After a life termer has been convicted of first degree murder, if a jury should determine from the totality of circumstances surrounding the offender and the offense that the death penalty is nonetheless an inappropriate sentence, societal values thereby have been expressed; and the system, as well as the society it serves, is the victor. I think due process of law requires no less.
C. The Severability of the Mandatory Death Provision The discussion of this aspect of my dissent proceeds on the premise that the statute's constitutional defect, under the test of due process, does not infest the whole of the statute. Rather, due process, in my opinion, invalidates only the mandatory death penalty provision. The death penalty, as a permissible sentence under the controlled discretion of the sentencing authority, remains intact and operative.
The will and intent of the legislature is clear, and it is our duty to carry out that intent to the fullest extent constitutionally permissible. Swindle v. State, 225 Ala. 247, 143 So. 198 (1932). Any supplementing of the statute to include life imprisonment as an alternative sentence is not to engage in judicial legislation, but merely to conform the legislative intent, as expressed in the statute, to constitutional standards. Pruett v. Patton, 288 Ala. 710, 265 So.2d 130 (1972).
Moreover, Tit. 14, § 318, Code, is an expression of the legislative policy to provide life imprisonment as the next most severe penalty for the commission of the offense of first degree murder. Thus, when the two statutes (§§ 318 and 319) are read together, this construction consists merely in reading the word "shall" in § 319 as "may." This Court has long recognized that the general rule of statutory construction importing an obligatory rather than a permissive meaning to the word "shall" is not without its exceptions. Notable among these exceptions is where the interchangeability of the two words ("may" and "shall") is necessary to render the statute constitutional. See Alabama State Board of Health, etc. v. Chambers County et al., 335 So.2d 653 (Ala.1976), and cases cited therein.[10]
Supportive authority for the interpretation that the statute is valid except for the mandatory death provision is also implicit in the United States Supreme Court's reversal of the death penalty in each of the three cases remanded to the States of North Carolina, Louisiana, and Oklahoma. The conviction in each of these cases was not reversed, only the mandatory death sentence.
*494 D. Remand for New Trial as to Sentence Only
It necessarily follows from the foregoing discussion, there being no reversible error in the trial proper below, that I would affirm the judgment of conviction for murder in the first degree; set aside the sentence of death and, on remand, order a new jury trial of this cause for an adjudication of the appropriate sentence.
I recognize that ordinarily the bifurcated proceedings prescribed below would be conducted before a single jury; that is, the same jury, where practicable, to whom the issue of innocence or guilt was tried, in the event of a verdict of guilty, would make the discretionary determination of the penalty of life imprisonment or death. For practical considerations, the latter determination in the instant case could not be made by the same jury that returned the guilty verdict; therefore, the Circuit Court to whom the case is remanded, upon proper notice to the parties, would impanel a petit jury, as provided by law in capital cases, for a sentencing hearing.
At the sentencing hearing, the State may show by way of aggravating circumstances any one or more of the following:
1. The murder was committed by a convict under sentence of imprisonment.
2. The defendant was previously convicted of another murder or of a felony involving the use of threat of violence to the person.
3. The defendant knowingly created a great risk of death to many persons.
4. The murder was committed while the defendant was engaged, or was an accomplice, in the commission of, or an attempt to commit, or flight after committing or attempting to commit, robbery, rape, or deviate sexual intercourse by force or threat of force, arson, burglary or kidnapping.
5. The murder was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from lawful custody.
6. The murder was committed for pecuniary gain.
7. The capital felony was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws.
8. The murder was intentionally and unnecessarily tortious to the victim, manifesting exceptional depravity.[11]
The convicted person may testify on his own behalf either under oath or affirmation or he may make an unsworn statement; in either event he, as all other witnesses, would be subject to cross examination. In addition, he may call any witness on his behalf. He may show any one or more of the following mitigating circumstances:
1. The defendant has no significant history of prior criminal activity.
2. The murder was committed while the defendant was under the influence of extreme mental or emotional disturbance.
3. The victim was a participant in the defendant's homicidal conduct or consented to the homicidal act.
4. The murder was committed under circumstances which the defendant believed to provide a moral justification or extenuation for his conduct.
5. The defendant was an accomplice in a murder committed by another person and his participation in the homicidal act was relatively minor.
6. The defendant acted under duress or under the domination of another person.
7. At the time of the murder, the capacity of the defendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or intoxication.
8. The youth of the defendant at the time of the crime.
9. The circumstances surrounding the charge and conviction for which he is serving a life sentence.

*495 10. The record of his performance as a prisoner during his tenure as a life termer.
11. Consistent with his defense in the main trial, he may deny that he committed the killing for which he is convicted, or he may show the relative duplicity of his conduct with that of others involved in the commission of the offense.
12. The extent to which his conviction is based on circumstantial evidence.
13. The conviction and sentence of others charged with the commission of the same offense; that is, the taking of the same life for which he has been convicted.
14. Any other facts or circumstances which have, or may tend to have, any probative value for the jury's assessment in determining his appropriate sentence.[12]
In the conduct of the sentencing hearing, the rules of evidence should be relaxed; and, while the criteria for aggravating circumstances are strictly construed against the State, proof of aggravating and mitigating circumstances may be by deposition, written interrogatories, affidavits or by reliable hearsay. While some discretion must of necessity be vested in the trial judge, wide latitude should be given the parties and their counsel in making opening statements, proffer of evidence, and in making closing arguments. Particularly, the convicted defendant should not be restricted unduly; for, literally, he is pleading for his life.
The trial judge should instruct the jury to consider, weigh, and weigh one against the other, all of the circumstances of the crime and the criminal in determining the appropriate sentence. He should instruct as to each of the aggravating and mitigating circumstances which is supported by any competent evidence. The jury is not required to find any mitigating circumstance to render a verdict of life imprisonment; but it must find beyond a reasonable doubt, designated in writing and signed by the foreman of the jury, at least one of the aggravating circumstances set out above before it can render a verdict of death. If the jury is unable to agree unanimously on a verdict at the sentencing hearing, the defendant should be sentenced to life in prison without parole.

IV. Judicial Review of Sentence

It will be noted that I have emphasized throughout this discussion that the discretionary sentencing authority should be vested in the jury. This is not because there is a constitutional right to be sentenced by a jury. The constitutional right of trial by jury does not of itself extend to the sentencing process. Rather, it is the constitutional due process of law requirement that mandates judicial review, both at the trial and appellate levels, of any sentence of death. In other words, only where the sentencing authority, under a discretionary death penalty statute, is vested in a jury can the due process requirement for judicial review be exercised by the trial judge. Obviously, the trial judge could not exercise judicial review over his own sentencing discretion. Moreover, where the weight and sufficiency of the evidence is the issue on appeal, the case is improperly postured for appellate review absent a judicial review of this issue by the trial judge.[13]
The trial judge's review of a jury's verdict fixing the penalty at death should be automatic and, where practicable, within 30 days from the date of the sentence. The trial court's scope of review should be as in other motions for relief after judgment generally, with due regard to the weight of the evidence in the main trial and in the sentencing hearing, including the evidence produced in aggravation and mitigation of the offender and the offense; and the trial *496 judge may reduce the death penalty to life imprisonment without parole if, in his considered judgment, the death penalty is an inappropriate sentence in the case.[14] In either eventthe imposition of the sentence of death or to life imprisonment without parolethe trial judge should set forth in writing, as a basis for the sentence, findings of fact from the trial and the sentencing hearing.
Due process, in my opinion, likewise requires, in addition to that review which is statutorily mandated for all capital cases, that the Court of Criminal Appeals and the Supreme Court, by automatic review, pass judgment upon the appropriateness of the death penalty, giving such cases preferential treatment, with due regard to all the circumstances in a particular case. I believe it is proper to leave to the Court of Criminal Appeals the initial task of establishing more definitive criteria for appellate review of the death sentence.[15] Suffice it to say, the stated aim of all judicial review in such cases is to provide, through due process of law, equal protection and uniformity of application of the infliction of the death penalty as nearly as human instrumentalities may achieve.

IV. Conclusion

By way of conclusion, I will comment briefly on that specific aspect of the majority opinion that holds: "We do not deem it constitutionally required that the sentencing authority consider mitigating circumstances as a condition to imposing the death penalty under Section 319. However, in this case such factors were before the jury, the sentencing authority."
Whether the death penalty may be constitutionally imposed, under § 319 absent a separate sentencing hearing for consideration of aggravating and mitigating circumstances is the ultimate question which must now be answered by the United States Supreme Court. It is this speculation that I would avoid by remanding the case for a sentencing hearing as set forth above. But, apart from this, it is the second sentence of the above-quoted language from the majority opinion to which I feel constrained to address my concluding comments.
The mitigating circumstances available to the defendant under his plea of not guilty go only to the jury's determination of the issue of the defendant's guilt of murder in the first degree or to a lesser included offense as instructed by the trial judge. This is something entirely different and distinct from permitting this same evidence of mitigating circumstances to be considered by the sentencing authority at a separate sentencing hearing following a verdict of guilty of murder in the first degree. Put another way, a jury may well discount evidence of mitigating circumstances as a defense to the homicide charge or as ample legal excuse for reducing the charge from first degree to second degree murder, on the one hand, while accepting the same evidence as sufficient justification, after a finding of guilty, for reducing the sentence from the death penalty to life imprisonment.
The peculiar facts of this case bear out this conclusion. The defendant's version of the extent of his participation is in substantial compliance with the oral statements taken from the witnesses shortly after the killing. It was not until after it was determined that Harris was the only life-termer involved in the incident and a subsequent investigation was made, including a retaking of witnesses' statements, that additional testimony was developed incriminating Harris beyond his initial participation in instigating the riot. A jury may very well have looked askance at the incriminating evidence supplied by the witnesses during *497 this subsequent investigation while, at the same time, believing the initial testimony sufficient for a conviction of murder in the first degree. Subsequently, this same jury, in a separate sentencing hearing after weighing all of the evidence, including the mitigating circumstances, may conclude that the death penalty was unjustified.
There is yet another factor which I believe should not be overlooked. Whatever the extent of Harris's participation in the killing of Wheeler Barrow, the avowed ring leader of this affray was another prisoner named Oscar Lee Johnson. He was implicated from beginning to end by each of the witnesses who testified. His trial for this murder resulted in a sentence of 31 years in prison. Johnson v. State, 335 So.2d 663 (Ala.Cr.App.1976).
Considering all of these factors together, I am constrained to the conclusion that the mandatory death penalty mandated by § 319 is violative of constitutional standards and I would affirm the conviction of murder in the first degree and reverse and remand as to the sentence.
SHORES, Justice (dissenting):
I dissent. The majority holds that there were sufficient aggravating circumstances considered by the jury to justify the imposition of the death penalty. First of all, even if true, those circumstances were considered at the guilt determining stage and not at the sentencing stage because, under the statute involved, there is only one stage. Secondly, where there are two stages, aggravating circumstances alone are not enough. As I read the cases from the Supreme Court of the United States, a jury must be allowed to consider not only all relevant evidence hearing on why the death penalty should be imposed but also all relevant evidence as to why it should not be. Jurek v. Texas, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929, U. S. Supreme Court, decided July 2, 1976.
The jury in this case was not charged to consider any mitigating circumstances whatsoever unless the judge's charge on lesser included offenses can be considered as such. I cannot so read it. I think the trial judge did exactly what the statute requires and no more. He instructed the jury on first degree murder and advised that if the state satisfied the jury beyond a reasonable doubt that the defendant was guilty of first degree murder, his punishment must necessarily be death because he was serving a life term in the penitentiary.
That this is true is evidenced by the court's charge where it was stated:
". . . Any convict sentenced to imprisonment for life, who commits murder in the first degree while such sentence remains in force against him, shall on conviction, suffer death. That is a matterthat is what the law directsnot what I direct, but what the law directs. It is not for the jury to pass on the question in its discretion as to whether that should be the law or whether he should suffer that punishment. That is what the law says is the punishment . . ."
In this, the trial judge correctly charged the jury under Title 14, § 319, Code. He is not to be criticized for failure to go beyond that. Nor is he supposed to be charged with clairvoyance. He had no way of knowing what the Supreme Court of the United States would subsequently rule in the July, 1976, cases.
If the constitutional standard set out in the several cases released by the Supreme Court of the United States on July 2, 1976, is applicable to this case, it is my opinion that it was not met.
There is no question that that court has not yet ruled on the precise question presented in this case i. e., whether a state can mandate the death penalty when the accused is an inmate serving a life sentence. The theory of such statutes is that if death cannot be mandated, the offender goes unpunished. At first glance, that thesis has some logical appeal. However, how can one distinguish between an inmate serving a life term and one serving several concurrent sentences, the total of which must necessarily exceed normal life expectancy? *498 If the theory is that there is no effective deterrent to first degree murder by an inmate serving a life term except mandatory death, it is equally applicable to the inmate serving consecutive sentences exceeding in terms of years that particular inmate's life expectancy for multiple crimes.
If it is constitutionally permissible to impose the death penalty based upon the previously established record and bad character of the accused (and I have little doubt that it is) instead of the character of the offense, then it seems to me that all such bad characters must be treated in the same manner, and simply limit the ultimate punishment to one category of inmate while sparing others is discriminatory and ignores the premise on which such legislation is based.
In summary, if tested by the standard established by the Supreme Court in the July, 1976, cases, this case falls short. If treated as not controlled by those cases, but as one which does not require the same constitutional standard, Title 14, § 319, still fails to meet constitutional requirements because of its inapplication to inmates serving sentences which equate life terms although expressed in terms of years.
BEATTY, Justice (concurring in part and dissenting in part).
I concur in that part of the majority opinion which sustains the conviction; however, with respect to the sentencing aspect I have different views.
The decision in this case may be reduced to the answers to three questions:
First, has the United States Supreme Court mandated consideration of mitigating circumstances which would affect the sentence of death in the instant case? In Jurek v. Texas, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), that Court commented:
. . . A jury must be allowed to consider on the basis of all relevant evidence not only why a death sentence should be imposed, but also why it should not be imposed.

Thus, in order to meet the requirement of the Eighth and Fourteenth Amendments, a capital-sentencing system must allow the sentencing authority to consider mitigating circumstances. In Gregg v. Georgia, we today hold constitutionally valid a capital-sentencing system that directs the jury to consider any mitigating factors, and in Proffitt v. Florida we likewise hold constitutional a system that directs the judge and advisory jury to consider certain enumerated mitigating circumstances. . . . Thus, the constitutionality of the Texas procedures turns on whether the enumerated questions allow consideration of particularized mitigating factors. (Emphasis supplied).

Although Jurek did not concern a life termer situation as here, I think the reasoning underlying the requirement to consider mitigating circumstances is sound and should apply to this situation. The United States Supreme Court dealt expressly with these reasons by observing:
. . . Because this system (consideration of mitigating circumstances) serves to assure that sentences of death will not be `wantonly' or `freakishly' imposed, it does not violate the (U.S.) Constitution.. . .
And in Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), the Court stated:
These procedures require the jury to consider the circumstances of the crime and the criminal before it recommends sentence. No longer can a Georgia jury do as Furman's jury did: reach a finding of the defendant's guilt and then, without guidance or direction, decide whether he should live or die. . . . Are there any special facts about this defendant that mitigate against imposing capital punishment (e. g., his youth, the extent of his co-operation with the police, his emotional state at the time of the crime).. . .
The basic concern of Furman centered on those defendants who were being condemned to death capriciously and arbitrarily. Under the procedures before the Court in that case, sentencing authorities *499 were not directed to give attention to the nature or circumstances of the crime committed or to the character or record of the defendant. . . (Emphasis supplied.)

This reasoning requires that mitigating factors be considered at the sentencing stage before the sentence of death is imposed. The rationale for considering mitigating factors is that it insures the fair imposition of a sentence which, though just, is the ultimate in extremity.
Since the first question is answered in the affirmative, a second question, which has not been answered, is whether the Alabama mandatory death statute for life convicts committing first degree murder allows the jury to consider mitigating circumstances at the sentencing stage.
Although Title 14, § 319, Alabama Code, does not expressly provide for the consideration of mitigating circumstances, in view of Jurek they must be incorporated into the sentencing procedure. The contention that any or all relevant mitigating circumstances were considered when the Court charged the jury that it could find the defendant guilty on numerous lesser included offenses, is simply untenable. First, under the Court's instructions these lesser included offenses were considered at the judgment stage i. e., on the issue of guilt of this or that offense, rather than at the sentencing stage. Second, the consideration by the jury of the possible commission of any lesser included offense can hardly be considered as a fact which mitigates the imposition of a higher degree of crime of which the accused may be guilty. That consideration goes merely to the degree of the crime committed, not to whether at the sentencing stage the death penalty for a higher crime should be imposed. And third, the lesser included offenses do not square with the mitigating factors described in Jurek and Gregg, and which may necessarily involve a range of factors beyond the factual elements which make up lesser included offenses. Consideration of those factual elements may seek to make the punishment fit the crime, as it were, but they do not make the punishment fit the criminal, as Jurek plainly requires, whatever the form of the death statute.
Finally, the third question to be resolved is whether Alabama sentencing procedure, as opposed to the sentence itself, is a matter upon which the Alabama Supreme Court may act, or is it a matter legislative in nature.
Thus, this final question is whether this Court, as the ultimate reviewing authority in this state, has the power to remand in order to allow either the trial judge or the jury to consider all mitigating circumstances.
No one has ever challenged the authority of this Court to remand a case. This Court remanded Jackson v. State, 285 Ala. 564, 234 So.2d 579 (1970) for an examination of excused veniremen when the state challenged them upon their answers regarding capital punishment. In Swain v. State, 290 Ala. 123, 274 So.2d 305 (1973) this Court exercised its judicial power by reducing a death sentence to life imprisonment. The Court of Appeals in Schenher v. State, 38 Ala.App. 573, 90 So.2d 234 (1956) exercised its inherent power in affirming a judgment but remanding the case to the trial court for imposition of the proper sentence (the trial court had improperly sentenced the defendant for a felony rather than a misdemeanor).
In none of these instances does it appear that any suggestion was made by anyone that such action was legislative in nature. In seems obvious to me that the Court was exercising its inherent judicial power over the procedure through which sentences are determined, as opposed to the amount or degree of the punishment permissible, which is a legislative prerogative. Therefore, if this Court could exercise its judicial power to direct such results as those indicated, a fortiori, it has the inherent judicial authority to remand this case to the trial court for action consistent with the requirements of Jurek. Indeed, sentencing itself at common law was a power which was reposed in the trial judge, 53 Va.L.Rev. 970, and although this power has been largely *500 assumed by statutes, it is retained in many instances. Cf. Tit. 22, §§ 258(47)-(53), Alabama Code. It is significant to me that the legislature did not include the word "jury" in the language of section 319, while in the next preceding statute dealing with the punishment for first and second degree murder, it expressly referred to the "discretion of the jury." Tit. 14, § 318, Alabama Code. If criminal statutes are strictly construed, we should give some meaning to this omission in the context of sentencing. Given the requirement of a review for proper sentencing mandated by Jurek, the common law power of the trial judge, and the express language of section 319, I believe either the trial judge or the jury would be a proper agency for the review of any mitigating circumstances.
With respect to the scope and nature of mitigating circumstances, trial courts may be depended upon to either apply themselves or guide juries under conditions of relevancy and proximity, as they do in other cases. Contemporary resource material such as the American Law Institute's Model Penal Code could serve as a guideline for the jury's consideration; other considerations which amplify the inquiry into possible mitigating circumstances may be equally relevant. The broad discretionary power of the trial judge, in any event, may remain unrestricted in order to satisfy the mandate of the United States Supreme Court. Further, should the trial judge himself decide that a jury is appropriate, it seems equally appropriate that the jury which adjudged guilt may be empaneled to reconsider the defendant's sentence. Failing that, I believe the inherent judicial power is sufficient to enable the trial court to empanel a new jury for the same purpose.
The least that should be required in this type of case is the procedure discussed here, especially when one considers the severity of the death penalty and the risks assumed without such a procedure. For these reasons, I would remand the case to the trial court so that it could effectuate this review procedure.
NOTES
[1] I disagree with the plurality opinion that the jury is the sentencing authority under Section 319. In my opinion, the trial judge is the sentencing authority. Admittedly, under Section 318, the jury not only determines guilt, but also determines the degree of homicide, and the punishment. Section 319 is also a sentencing statute, but the jury determines only guilt and degree of homicide. The statute mandates the sentence, which the judge, not the jury, imposes. At common law, the power to sentence resided in the judge, and Alabama follows the common law unless changed by statute. Title 1, Section 3, Code.
[2] "THE COURT: I see no reason why we should postpone the sentencing. You may come and stand by the Bar.

"REPORTER'S NOTE: The defendant and His Attorneys, Mr. Dees and Mr. Cooper, come to the Bench.
"THE COURT: Now the defendant, Johnny Harris, is before me and I am stating to him, that you have the verdict of the jury: We, the jury, find the defendant guilty of murder in the first degree as charged in the indictment and fix his punishment at death. R. A. White Foreman. Do you have anything to say as to why the sentence should not be imposed upon you?
THE DEFENDANT: No sir.
"THE COURT: Some one give me a calendar, please.
"REPORTER'S NOTE: Mr. Hendrix hands the Judge a calendar.
"THE COURT: The defendant having answered NO, it is therefore, ordered and adjudged by the Court that the defendant be, and he is hereby sentenced to death by electrocution to be executed on April 18th., and I believe if you will check that for me, that will be how many weeks from today?
"MR. HENDRIX: Seven weeks.
"THE COURT: All right, the defendant automatically has, and he requests an appeal of this judgment of conviction and execution is suspended pending such appeal."
[1] Roberts v. Louisiana, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976); Jurek v. Texas, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913, (1976); Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); Green v. Oklahoma, 428 U.S. 907, 96 S.Ct. 3216, 49 L.Ed.2d 1214 (1976); and Woodson v. North Carolina, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). Subsequently, in Roberts v. Louisiana, 431 U.S. 633, 97 S.Ct. 1993, 52 L.Ed.2d 637 (1977), the Supreme Court likewise struck down another provision of the Louisiana statute, which mandated the death penalty upon a finding of first degree murder when the victim is a police officer.
[2] While the United States Supreme Court observes that a bifurcated procedure is not necessarily essential, it is interesting to note that of the three cases affirmed a bifurcated procedure is provided by statute in each state; and certain aggravating and mitigating circumstances are enumerated by statute in 2 states (Georgia and Florida) and judicially imposed in the 3rd (Texas).
[3] For example, the following appears in a footnote in Woodson v. North Carolina, supra: "This case does not involve a mandatory death penalty statute limited to an extremely narrow category of homicide, such as murder by a prisoner serving a life sentence, defined in large part in terms of the character or record of the offender. We thus express no opinion regarding the constitutionality of such a statute." Likewise, the reference is carried forward in the recent Harry Robert's case.
[4] For a good statement of this rule, see Oregon v. Hass, 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975).
[5] For a recent statement of an emerging policy of Federal-State judicial relationship in the context of Fourth Amendment rights, see Mr. Justice Powell's excellent opinion in Stone v. Powell, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976).
[6] Alabama Constitution 1901 provides:

Article 1, § 6: ". . . the accused . . . shall not . . . be deprived of life . . . except by due process of law . . ."
Article 1, § 13: ". . . every person, for any injury done him, in his lands, goods, person, or reputation, shall have a remedy by due process of law".
Article 1, § 15: "That excessive fines shall not be imposed, nor cruel or unusual punishment inflicted."
[7] Chief Justice Warren, writing for the Court in Trop v. Dulles, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958), formulated the following rule for construing the Cruel And Unusual Punishment Clause: ". . . the words of the Amendment are not precise, and . . . their scope is not static. The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." 356 U.S., at 100, 101, 78 S.Ct., at 598. (Emphasis added.)
[8] For the historical evolvement of due process, see Dorman v. State, 34 Ala. 216, 236 (1859).
[9] While not of sufficient significance to avoid the suggested dilemma, it should be noted that not all life termers equate for purposes of eligibility for release on parole. Under certain circumstances, a life termer may be eligible for parole sooner than if he had received a 35-year sentence for the same offense. Certainly, it is not anticipated that a person given a life sentence under this or any other discretionary death penalty statute would ever be eligible for release on parole, except, perhaps, through executive clemency.
[10] For a somewhat analogous situation, see Pierce v. State, 292 Ala. 473, 296 So.2d 218 (1974), where this Court engrafted the Miller [Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419] standards into Alabama's obscenity statute. See also Jackson v. State, 337 So.2d 1242 (Miss. 1976).
[11] This list of aggravating circumstances is § 210.6 (Proposed Official Draft, 1962). taken substantially from the Model Penal Code.
[12] The first 8 of these mitigating circumstances are taken substantially from the Model Penal Code. The next 5 are tailored more specifically for this particular case. # 14 is included to indicate that the 13 listed circumstances are not intended as all inclusive.
[13] This is not to indicate that due process requirements impose a constitutional limitation on the trial court as the sentencing authority in other than death penalty cases.
[14] Nothing contained herein shall be construed as limiting, or in any way modifying, the trial court's traditional scope of review of a motion for a new trial with respect to the issue of innocence or guilt.
[15] Where the jury's death verdict is reduced to a life sentence without parole by the trial judge, the Court of Criminal Appeals, in an appropriate case, may also determine, in keeping with the policy of uniformity of application, the propriety of appellate review on behalf of the State.