## ROBERTS *v.* LOUISIANA

No. 76–5206.   Argued March 28, 1977—Decided June 6, 1977

*Garland R. Rolling* argued the cause and filed briefs for petitioner.

*Louise Korns* argued the cause for respondent.   With her on the briefs were *William J. Guste, Jr.,* Attorney General of Louisiana, and *Harry F. Connick.*

*Jules E. Orenstein,* Assistant Attorney General, argued the cause for the State of New York as *amicus curiae.*   With him on the brief were *Louis J. Lefkowitz,* Attorney General, and *Samuel A. Hirshowitz,* First Assistant Attorney General.*

Per Curiam.

Petitioner Harry Roberts was indicted, tried, and convicted of the first-degree murder of Police Officer Dennis McInerney, who at the time of his death was engaged in the performance

---

*Frank Carrington, Wayne W. Schmidt, Glen R. Murphy, Courtney Evans, Cecil Hicks,* and *James P. Costello* filed a brief for Americans for Effective Law Enforcement, Inc., et al. as *amici curiae* urging affirmance.

*Evelle J. Younger,* Attorney General, *Jack R. Winkler,* Chief Assistant Attorney General, *S. Clark Moore* and *William E. James,* Assistant Attorneys General, and *Howard J. Schwab* and *Alexander W. Kirkpatrick,* Deputy Attorneys General, filed a brief for the State of California as *amicus curiae.*

of his lawful duties. As required by a Louisiana statute, petitioner was sentenced to death. La. Rev. Stat. Ann. § 14:30 (2) (1974).[1] On appeal, the Supreme Court of Louisiana affirmed his conviction and sentence. 331 So. 2d 11 (1976). Roberts then filed a petition for a writ of certiorari in this Court. The petition presented the question whether Louisiana's mandatory death penalty could be imposed pursuant to his conviction of first-degree murder as defined in subparagraph (2) of § 14:30.

Shortly before that petition was filed, we held in another case (involving a different petitioner named Roberts) that Louisiana could not enforce its mandatory death penalty for a

---

[1] That section provides in part:

*"First degree murder*

"First degree murder is the killing of a human being:

"(1) When the offender has a specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of aggravated kidnapping, aggravated rape or armed robbery; or

"(2) When the offender has a specific intent to kill, or to inflict great bodily harm upon, a fireman or a peace officer who was engaged in the performance of his lawful duties; or

"(3) Where the offender has a specific intent to kill or to inflict great. bodily harm and has previously been convicted of an unrelated murder or is serving a life sentence; or

"(4) When the offender has a specific intent to kill or to inflict great bodily harm upon more than one person; [or]

"(5) When the offender has specific intent to commit murder and has been offered or has received anything of value for committing the murder.

"For the purposes of Paragraph (2) herein, the term peace officer shall be defined [as] and include any constable, sheriff, deputy sheriff, local or state policeman, game warden, federal law enforcement officer, jail or prison guard, parole officer, probation officer, judge, district attorney, assistant district attorney or district attorneys' investigator.

"Whoever commits the crime of first degree murder shall be punished by death."

In 1975, § 14:30 (1) was amended to add the crime of aggravated burglary as a predicate felony for first-degree murder. 1975 La. Acts, No. 327.

conviction of first-degree murder as defined in subparagraph (1) of § 14:30 of La. Rev. Stat. Ann. (1974). *Roberts* v. *Louisiana,* 428 U. S. 325 (1976) (hereafter cited as *Stanislaus Roberts* for purposes of clarity). In the plurality opinion in that case, the precise question presented in this case was explicitly answered.[2]

This precise question was again answered by the Court in *Washington* v. *Louisiana,* 428 U. S. 906 (1976). The petitioner in the *Washington* case had killed a policeman and was tried and sentenced to death under the same provision of the Louisiana statute as was the petitioner in the present case. We vacated the death sentence, holding: "Imposition and carrying out of the death penalty [in this case] constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. *Roberts* v. *Louisiana. . . ." Ibid.* See also *Sparks* v. *North Carolina,* 428 U. S. 905 (1976); *Green* v. *Oklahoma,* 428 U. S. 907 (1976).

---

[2] "The diversity of circumstances presented in cases falling within the single category of killings during the commission of a specified felony, as well as the variety of possible offenders involved in such crimes, underscores the rigidity of Louisiana's enactment and its similarity to the North Carolina statute. Even the other more narrowly drawn categories of first-degree murder in the Louisiana law [one of these being the wilful, deliberate, and premeditated homicide of a fireman or a police officer engaged in the performance of his lawful duties] afford no meaningful opportunity for consideration of mitigating factors presented by the circumstances of the particular crime or by the attributes of the individual offender." 428 U. S., at 333–334.

"*Only* the third category of the Louisiana first-degree murder statute, covering intentional killing by a person serving a life sentence or by a person previously convicted of an unrelated murder, defines the capital crime at least in significant part in terms of the character or record of the individual offender. Although even this narrow category does not permit the jury to consider possible mitigating factors, a prisoner serving a life sentence presents a unique problem that may justify such a law. See *Gregg* v. *Georgia,* [428 U. S. 153, 186 (1976)]; *Woodson* v. *North Carolina,* [428 U. S. 280, 287 n. 7, 292–293, n. 25 (1976)]." *Id.,* at 334 n. 9 (emphasis added).

Recognizing that this Court had already decided that a mandatory death sentence could not be imposed for the crime that Harry Roberts committed, the Attorney General of Louisiana initially conceded that "under this Court's decision in *Stanislaus Roberts* v. *Louisiana,* No. 75–5844, [the sentence of death in the present case] cannot be carried out unless, of course, this Court grants Louisiana's Application for Rehearing and modifies its former holding." Brief in Opposition 2–3. The Court nevertheless granted certiorari on November 8, 1976, 429 U. S. 938, and on November 29 limited the grant to the question "[w]hether the imposition and carrying out of the sentence of death for the crime of first-degree murder of a police officer under the law of Louisiana violates the Eighth and Fourteenth Amendments to the Constitution of the United States." 429 U. S. 975.

In *Woodson* v. *North Carolina,* 428 U. S. 280, 304 (1976), this Court held that "the fundamental respect for humanity underlying the Eighth Amendment . . . requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." In *Stanislaus Roberts, supra,* we made clear that this principle applies even where the crime of first-degree murder is narrowly defined. See n. 2, *supra.*

To be sure, the fact that the murder victim was a peace officer performing his regular duties may be regarded as an aggravating circumstance. There is a special interest in affording protection to these public servants who regularly must risk their lives in order to guard the safety of other persons and property.[3] But it is incorrect to suppose that no miti-

---

[3] We recognize that the life of a police officer is a dangerous one. Statistics show that the number of police officers killed in the line of duty has more than doubled in the last 10 years. In 1966, 57 law enforcement officers were killed in the line of duty; in 1975, 129 were killed. Federal Bureau of Investigation, Crime in the United States 1975, Uniform Crime Reports 223 (1976).

gating circumstances can exist when the victim is a police officer. Circumstances such as the youth of the offender, the absence of any prior conviction, the influence of drugs, alcohol, or extreme emotional disturbance, and even the existence of circumstances which the offender reasonably believed provided a moral justification for his conduct are all examples of mitigating facts which might attend the killing of a peace officer and which are considered relevant in other jurisdictions.[4]

As we emphasized repeatedly in *Stanislaus Roberts* and its companion cases decided last Term, it is essential that the capital-sentencing decision allow for consideration of whatever mitigating circumstances may be relevant to either the particular offender or the particular offense.[5] Because the Louisiana statute does not allow for consideration of particularized mitigating factors, it is unconstitutional.[6]

---

[4] See, *e. g.*, the portion of the proposed standards of the Model Penal Code quoted in *Gregg* v. *Georgia,* 428 U. S. 153, 193–194, n. 44 (1976).

[5] We reserve again the question whether or in what circumstances mandatory death sentence statutes may be constitutionally applied to prisoners serving life sentences. See n. 2, *supra,* quoting 428 U. S., at 334 n. 9.

[6] Indeed, our holding in *Jurek* v. *Texas,* 428 U. S. 262 (1976), that the Texas sentencing procedure was constitutionally adequate rested squarely on the fact that mitigating circumstances could be considered by the jury. In that case the joint opinion of JUSTICES STEWART, POWELL, and STEVENS stated:

"But a sentencing system that allowed the jury to consider only aggravating circumstances would almost certainly fall short of providing the individualized sentencing determination that we today have held in *Woodson* v. *North Carolina,* [428 U. S.,] at 303–305, to be required by the Eighth and Fourteenth Amendments. For such a system would approach the mandatory laws that we today hold unconstitutional in *Woodson* and *Roberts* v. *Louisiana* [428 U. S. 325 (1976)]. A jury must be allowed to consider on the basis of all relevant evidence not only why a death sentence should be imposed, but also why it should not be imposed.

"Thus, in order to meet the requirement of the Eighth and Fourteenth Amendments, a capital-sentencing system must allow the sentencing authority to consider mitigating circumstances. In *Gregg* v. *Georgia,* we

Accordingly, we hold that the death sentence imposed upon this petitioner violates the Eighth and Fourteenth Amendments and must be set aside. The judgment of the Supreme Court of Louisiana is reversed insofar as it upholds the death sentence upon petitioner. The case is remanded for further proceedings not inconsistent with this opinion.[7]

*It is so ordered.*

Mr. Chief Justice Burger, dissenting.

I would sustain the Louisiana statute and I therefore dissent on the basis of my dissenting statement in *Roberts* v. *Louisiana,* 428 U. S. 325, 337 (1976), and that of Mr. Justice White in *Woodson* v. *North Carolina,* 428 U. S. 280, 306 (1976).

Mr. Justice Blackmun, with whom Mr. Justice White and Mr. Justice Rehnquist join, dissenting.

The Court, feeling itself bound by the plurality opinion in *Roberts* v. *Louisiana,* 428 U. S. 325 (1976) (hereafter *Stanislaus Roberts*), has painted itself into a corner. I did not join that plurality opinion, and I decline to be so confined. I therefore dissent from the Court's disposition of the present

today hold constitutionally valid a capital-sentencing system that directs the jury to consider any mitigating factors, and in *Proffitt* v. *Florida* we likewise hold constitutional a system that directs the judge and advisory jury to consider certain enumerated mitigating circumstances. The Texas statute does not explicitly speak of mitigating circumstances; it directs only that the jury answer three questions. Thus, the constitutionality of the Texas procedures turns on whether the enumerated questions allow consideration of particularized mitigating factors." *Id.,* at 271–272 (footnote omitted).

[7] In joining this opinion for the Court, Mr. Justice Brennan and Mr. Justice Marshall agree that the plurality opinion in *Stanislaus Roberts, supra,* controls this case, but adhere to their view that capital punishment is in all circumstances prohibited as cruel and unusual punishment by the Eighth and Fourteenth Amendments.

case and from its holding that the mandatory imposition of the death penalty for killing a peace officer, engaged in the performance of his lawful duties, constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. I would uphold the State's power to impose such a punishment under La. Rev. Stat. Ann. § 14:30 (2) (1974), and I would reject any statements or intimations to the contrary in the Court's prior cases.

The *per curiam* opinion asserts that "the precise question presented in this case was explicitly answered" in *Stanislaus Roberts. Ante,* at 635. It also relies on the summary disposition of *Washington* v. *Louisiana,* 428 U. S. 906 (1976), where a death sentence that had been imposed under § 14:30 (2) was vacated and where it was stated that the imposition and carrying out of the death penalty constituted cruel and unusual punishment. *Ante,* at 635. Finally, the *per curiam* states that "it is essential that the capital-sentencing decision allow for consideration of whatever mitigating circumstances may be relevant to either the particular offender or the particular offense." *Ante,* at 637. Since § 14:30 (2) does not allow for consideration of mitigating factors, the *per curiam* strikes down the death sentence imposed on petitioner.

In my view, the question of the constitutionality of Louisiana's mandatory death penalty for killing a peace officer was not answered in *Stanislaus Roberts. Washington* may be said to be a summary ruling on the merits, but that case was decided without the benefit of plenary consideration, and without focusing on the identity and activity of the victim. I believe its result to be incorrect as a constitutional matter and I would disapprove and withhold its further application.

Stanislaus Roberts was charged and convicted under a different subsection, that is, § 14:30 (1), of the Louisiana first-degree murder statute. See 428 U. S., at 327. See also *ante,* at 634–635. Subsection (1) provided a mandatory death penalty in the case where the killer had a specific intent to kill or

to inflict great bodily harm and was engaged in the perpetration or attempted perpetration of aggravated kidnaping, aggravated rape, or armed robbery. See *ante,* at 634 n. 1. Subsection (2), in contrast, provides that first-degree murder is committed when the killer has a specific intent to kill, or to inflict great bodily harm upon, a fireman or a peace officer who is engaged in the performance of his lawful duties. *Ibid.* The two subsections obviously should involve quite different considerations with regard to the lawfulness of a mandatory death penalty, even accepting the analysis set forth in the joint opinions of last Term.* Thus, to the extent that the plurality in *Stanislaus Roberts* alluded to subsections of the Louisiana law that were not before the Court, those statements are nonbinding dicta. It is indisputable that carefully focused consideration was not given to the special problem of a mandatory death sentence for one who has intentionally killed a police officer engaged in the performance of his lawful duties. I therefore approach this case as a new one, not predetermined and governed by the plurality in *Stanislaus Roberts.*

*Washington* may present a different problem. It did decide the issue now before the Court, but it did so without the benefit of full briefing and argument, and it was one of three pending Louisiana cases treated as a cluster and routinely remanded at the Term's end in the immediate wake of *Stanislaus Roberts.* Because an explicit finding was made that the death penalty constituted cruel and unusual punishment, perhaps *Washington* is not to be treated in the same way as summary affirmances were treated in *Edelman* v. *Jordan,* 415 U. S. 651, 670–671 (1974). I would simply inquire, as to *Washington,* whether its holding should not be overruled,

---

*Gregg* v. *Georgia,* 428 U. S. 153 (1976); *Proffitt* v. *Florida,* 428 U. S. 242 (1976); *Jurek* v. *Texas,* 428 U. S. 262 (1976); *Woodson* v. *North Carolina,* 428 U. S. 280 (1976); and *Stanislaus Roberts,* 428 U. S. 325 (1976).

now that the Court has had the benefit of more careful and complete consideration of the issue.

On the merits, for reasons I have expressed before, I would not find § 14:30 (2) constitutionally defective. See *Furman v. Georgia,* 408 U. S. 238, 405–414 (1972) (dissenting opinion). See also *Stanislaus Roberts,* 428 U. S., at 337–363 (WHITE, J., dissenting). Furthermore, even under the opinions of last Term, I would conclude that § 14:30 (2) falls within that narrow category of homicide for which a mandatory death sentence is constitutional. See *Gregg* v. *Georgia,* 428 U. S. 153, 186 (1976); *Woodson* v. *North Carolina,* 428 U. S. 280, 287 n. 7, 292–293, n. 25 (1976); *Stanislaus Roberts,* 428 U. S., at 334 n. 9. Since the decision in *Washington* is inconsistent with this view, I would overrule it.

I should note that I do not read the *per curiam* opinion today as one deciding the issue of the constitutionality of a mandatory death sentence for a killer of a peace officer for all cases and all times. Reference to the plurality opinion in *Stanislaus Roberts* reveals that the Louisiana statute contained what that opinion regarded as two fatal defects: lack of an opportunity to consider mitigating factors, and standardless jury discretion inherent in the Louisiana responsive verdict system. Without the latter, as here, a different case surely is presented. Furthermore, it is evident, despite the *per curiam*'s general statement to the contrary, that mitigating factors need not be considered in every case; even the *per curiam* continues to reserve the issue of a mandatory death sentence for murder by a prisoner already serving a life sentence. *Ante,* at 637 n. 5. Finally, it is possible that a state statute that required the jury to consider, during the guilt phase of the trial, both the aggravating circumstance of killing a peace officer and relevant mitigating circumstances would pass the plurality's test. Cf. *Jurek* v. *Texas,* 428 U. S. 262, 270–271 (1976). For me, therefore, today's decision must be viewed in the context of the Court's previous criticism of the Louisiana system;

it need not freeze the Court into a position that condemns every statute with a mandatory death penalty for the intentional killing of a peace officer.

MR. JUSTICE REHNQUIST, with whom MR. JUSTICE WHITE joins, dissenting.

The Court today holds that the State of Louisiana is not entitled to vindicate its substantial interests in protecting the foot soldiers of an ordered society by mandatorily sentencing their murderers to death. This is so even though the State has demonstrated to a jury in a fair trial, beyond a reasonable doubt, that a particular defendant was the murderer, and that he committed the act while possessing "a specific intent to kill, or to inflict great bodily harm upon, . . . a peace officer who was engaged in the performance of his lawful duties . . . ." La. Rev. Stat. Ann. § 14:30 (2) (1974). That holding would have shocked those who drafted the Bill of Rights on which it purports to rest, and would commend itself only to the most imaginative observer as being required by today's "evolving standards of decency."

I am unable to agree that a mandatory death sentence under such circumstances violates the Eighth Amendment's proscription against "cruel and unusual punishments." I am equally unable to see how this limited application of the mandatory death statute violates even the scope of the Eighth Amendment as seen through the eyes of last Term's plurality in *Roberts* v. *Louisiana,* 428 U. S. 325 (1976) (hereafter *Stanislaus Roberts*). Nor does the brief *per curiam* opinion issued today demonstrate why the application of a mandatory death sentence to the criminal who intentionally murders a peace officer performing his official duties should be considered "cruel and unusual punishment" in light of either the view of society when the Eighth Amendment was passed, *Gregg* v. *Georgia,* 428 U. S. 153, 176–177 (1976); the "objective indicia that reflect the public attitude" today, *id.,* at 173; or even the more

generalized "basic concept of human dignity" test relied upon last Term in striking down several more general mandatory statutes.

While the arguments weighing in favor of individualized consideration for the convicted defendant are much the same here as they are for one accused of any homicide, the arguments weighing in favor of society's determination to impose a mandatory sentence for the murder of a police officer in the line of duty are far stronger than in the case of an ordinary homicide. Thus the Court's intimation that this particular issue was *considered* and *decided* last Term in *Stanislaus Roberts, supra,* simply does not wash. A footnoted dictum in *Stanislaus Roberts* discussing a different section of the Louisiana law from the one now before us scarcely rises to the level of plenary, deliberate consideration which has traditionally preceded a declaration of unconstitutionality.

Such a meager basis for *stare decisis* would be less offensive were we not dealing with large questions of how men shall be governed, and how liberty and order should be balanced in a civilized society. But authority which might suffice to determine whether the rule against perpetuities applies to a particular devise in a will does not suffice when making a constitutional adjudication that a punishment imposed by properly enacted state law is "cruel and unusual." Mr. Justice Frankfurter wisely noted that a "footnote hardly seems to be an appropriate way of announcing a new constitutional doctrine," *Kovacs* v. *Cooper,* 336 U. S. 77, 90–91 (1949); it is hardly a more appropriate device by which to anticipate a constitutional issue not presented by the case in which it appears. This seemingly heedless wielding of our power is least acceptable when we engage in what Mr. Justice Holmes described as "the gravest and most delicate duty that this Court is called upon to perform." *Blodgett* v. *Holden,* 275 U. S. 142, 147–148 (1927) (separate opinion).

Five Terms ago, in *Furman* v. *Georgia*, 408 U. S. 238 (1972), this Court invalidated the then-current system of capital punishments, condemning jury discretion as resulting in "freakish" punishment. The Louisiana Legislature has conscientiously determined, in an effort to respond to that holding, that the death sentence would be made mandatory upon the conviction of particular types of offenses, including, as in the case before us, the intentional killing of a peace officer while in the performance of his duties. For the reasons stated by MR. JUSTICE WHITE for himself, THE CHIEF JUSTICE, MR. JUSTICE BLACKMUN, and me in his dissent in *Stanislaus Roberts, supra,* and by me in my dissent in *Woodson* v. *North Carolina,* 428 U. S. 280, 308 (1976), I am no more persuaded now than I was then that a mandatory death sentence for all, let alone for a limited class of, persons who commit premeditated murder constitutes "cruel and unusual punishment" under the Eighth and Fourteenth Amendments.

But even were I now persuaded otherwise by the plurality's analysis last Term, and were I able to conclude that the mandatory death penalty constituted "cruel and unusual punishment" when applied generally to all those convicted of first-degree murder, I would nonetheless disagree with today's opinion. Louisiana's decision to impose a mandatory death sentence upon one convicted of the particular offense of premeditated murder of a peace officer engaged in the performance of his lawful duties is clearly not governed by the holding of *Stanislaus Roberts,* and I do not believe that it is controlled by the reasoning of the plurality's opinion in that case. Today's opinion assumes, without analysis, that the faults of the generalized mandatory death sentence under review in *Stanislaus Roberts,* must necessarily inhere in such a sentence imposed on those who commit this much more carefully limited and far more serious crime.[1] In words that would be

---

[1] In *Woodson,* the plurality noted that a public opinion poll "revealed that a 'substantial majority' of persons opposed mandatory capital punish-

equally appropriate today, Mʀ. Jᴜsᴛɪᴄᴇ Wʜɪᴛᴇ noted last Term, 428 U. S., at 358:

> "Even if the character of the accused *must* be considered under the Eighth Amendment, surely a State is not constitutionally forbidden to provide that the commission of certain crimes conclusively establishes that the criminal's character is such that he deserves death. Moreover, quite apart from the character of a criminal, a State should constitutionally be able to conclude that the need to deter some crimes and that the likelihood that the death penalty will succeed in deterring these crimes is such that the death penalty may be made mandatory for all people who commit them. Nothing resembling a reasoned basis for the rejection of these propositions is to be found in the plurality opinion."

ment." 428 U. S., at 298–299, n. 34. It does not follow, even accepting that poll, that a "substantial majority" oppose mandatory capital punishment for the murderers of police officers. What meager statistics there are indicate that public opinion is at best pretty evenly divided on the subject. In a June 1973 Harris Survey, 41% of the people surveyed thought that "all" persons convicted of killing a policeman or a prison guard should get the death penalty; as opposed to 28% for the more general crime of first-degree murder. Vidmar & Ellsworth, Public Opinion and the Death Penalty, 26 Stan. L. Rev. 1245, 1252 (1974). A May 1973 poll in Minnesota revealed that 49% of the sample favored "automatic" capital punishment for "'murder of a law enforcement officer.'" *Id.*, at 1251. With such substantial public support, one would have thought that the determination as to whether a mandatory death penalty should exist was for the legislature, not for the judiciary through some newfound construction of the term "cruel and unusual punishments." Yet while the plurality observes that "[c]entral to the application of the Amendment is a determination of contemporary standards regarding the infliction of punishment," 428 U. S., at 288, the opinion today makes absolutely no attempt to discuss "contemporary standards" with respect to the particular category now before us. The reason, of course, is not hard to deduce: the plurality's separation of "standards of decency" from "the dignity of man" indicates that, with respect to the latter, the plurality itself, and not society, is to be the arbiter.

Under the analysis of last Term's plurality opinion, a State, before it is constitutionally entitled to put a murderer to death, must consider aggravating and mitigating circumstances. It is possible to agree with the plurality in the general case without at all conceding that it follows that a mandatory death sentence is impermissible in the specific case we have before us: the deliberate killing of a peace officer. The opinion today is willing to concede that "the fact that the murder victim was a peace officer performing his regular duties may be regarded as an aggravating circumstance." *Ante,* at 636. But it seems to me that the factors which entitle a State to consider it as an aggravating circumstance also entitle the State to consider it so grave an aggravating circumstance that no permutation of mitigating factors exists which would disable it from constitutionally sentencing the murderer to death. If the State would be constitutionally entitled, due to the nature of the offense, to sentence the murderer to death *after* going through such a limited version of the plurality's "balancing" approach, I see no constitutional reason why the "Cruel and Unusual Punishments" Clause precludes the State from doing so without engaging in that process.

The elements that differentiate this case from the *Stanislaus Roberts* case are easy to state. In both cases, the factors weighing on the defendant's side of the scale are constant. It is consideration of these factors alone that the opinion today apparently relies on for its holding. But this ignores the significantly different factors which weigh on the State's side of the scale. In all murder cases, and of course this one, the State has an interest in protecting its citizens from such ultimate attacks; this surely is at the core of the Lockean "social contract" idea. But other, and important, state interests exist where the victim was a peace officer performing his lawful duties. Policemen on the beat are exposed, in the service of society, to all the risks which the constant effort to prevent crime and apprehend criminals entails: Because these people

are literally the foot soldiers of society's defense of ordered liberty, the State has an especial interest in their protection.

We are dealing here not merely with the State's determination as to whether particular conduct on the part of an individual should be punished, and in what manner, but also with what sanctions the State is entitled to bring into play to assure that there will be a police force to see that the criminal laws are enforced at all. It is no service to individual rights, or to individual liberty, to undermine what is surely the fundamental right and responsibility of any civilized government: the maintenance of order so that all may enjoy liberty and security. Learned Hand surely had it right when he observed:

> "And what is this liberty which must lie in the hearts of men and women? It is not the ruthless, the unbridled will; it is not freedom to do as one likes. That is the denial of liberty, and leads straight to its overthrow. A society in which men recognize no check upon their freedom soon becomes a society where freedom is the possession of only a savage few; as we have learned to our sorrow." The Spirit of Liberty 190 (3d ed., 1960).

Policemen are both symbols and outriders of our ordered society, and they literally risk their lives in an effort to preserve it. To a degree unequaled in the ordinary first-degree murder presented in the *Stanislaus Roberts* case, the State therefore has an interest in making unmistakably clear that those who are convicted of deliberately killing police officers acting in the line of duty be forewarned that punishment, in the form of death, will be inexorable.[2]

---

[2] Cf. 4 W. Blackstone, Commentaries *82:

"To resist the king's forces by defending a castle against them, is a levying of war . . . . But a tumult, with a view to pull down a particular house, or lay open a particular inclosure, amounts at most to a riot; this being no general defiance of public government."

As recently noted by Chief Justice Laskin of the Canadian Supreme Court,

This interest of the State, I think, entitled the Louisiana Legislature, in its considered judgment, to make the death penalty mandatory for those convicted of the intentional murder of a police officer. I had thought JUSTICES STEWART, POWELL, and STEVENS had conceded that this response—this need for a mandatory penalty—could be permissible when, focusing on the crime, not the criminal, they wrote last Term in *Gregg*, 428 U. S., at 184, that

> "the decision that capital punishment may be the appropriate sanction in extreme cases is an expression of the community's belief that certain *crimes* are themselves so grievous an affront to humanity that the only adequate response may be the penalty of death." (Emphasis added.)

I am quite unable to decipher why the Court today concludes that the intentional murder of a police officer is not one of these "certain crimes." The Court's answer appears to lie in its observation that "it is incorrect to suppose that no mitigating circumstances can exist when the victim is a police officer." *Ante,* at 636–637. The Court, however, has asked the wrong question. The question is not whether mitigating

---

*Miller and Cockriell* v. *The Queen,* 70 D. L. R. 3d 324, 337, [1976] 5 W. W. R. 711, 735 (1976), in discussing whether a mandatory death sentence constituted "cruel and unusual punishment" within the meaning of § 2 (*b*) of the Canadian Bill of Rights:

"I do not think, however, that it can be said that Parliament, in limiting the mandatory death penalty to the murder of policemen and prison guards, had only vengeance in view. There was obviously the consideration that persons in such special positions would have a sense of protection by reason of the grave penalty that would follow their murder . . . . It was open to Parliament to act on these additional considerations in limiting the mandatory death penalty as it did, and I am unable to say that they were not acted upon. On this view, I cannot find that there was no social purpose served by the mandatory death penalty so as to make it offensive to § 2 (*b*)." (Concurring opinion.)

factors might *exist,* but, rather, whether whatever "mitigating" factors that might exist are of sufficient *force* so as to constitutionally require their consideration as counterweights to the admitted aggravating circumstance. Like MR. JUSTICE WHITE, I am unable to believe that a State is not entitled to determine that the premeditated murder of a peace officer is so heinous and intolerable a crime that no combination of mitigating factors can overcome the demonstration "that the criminal's character is such that he deserves death." 428 U. S., at 358.

As an example of a mitigating factor which, presumably, may "overcome" the aggravating factor inherent in the murder of a peace officer, the Court today gives us the astonishing suggestion of "the existence of circumstances which the offender reasonably believed provided a moral justification for his conduct . . . ." *Ante,* at 637. I cannot believe that States are constitutionally required to allow a defense, even at the sentencing stage, which depends on nothing more than the convict's moral belief that he was entitled to kill a peace officer in cold blood. John Wilkes Booth may well have thought he was morally justified in murdering Abraham Lincoln, whom, while fleeing from the stage of Ford's Theater, he characterized as a "tyrant"; I am appalled to believe that the Constitution would have *required* the Government to allow him to argue that as a "mitigating factor" before it could sentence him to death if he were found guilty. I am equally appalled that a State should be required to instruct a jury that such individual beliefs must or should be considered as a possible balancing factor against the admittedly proper aggravating factor.

The historical and legal content of the "Cruel and Unusual Punishments" Clause was stretched to the breaking point by the plurality's opinion in the *Stanislaus Roberts* case last Term. Today this judicially created superstructure, designed and erected more than 180 years after the Bill of Rights was

adopted, is tortured beyond permissible limits of judicial review. There is nothing in the Constitution's prohibition against cruel and unusual punishment which disables a legislature from imposing a mandatory death sentence on a defendant convicted after a fair trial of deliberately murdering a police officer.