Chief Judge Breitel (dissenting in part).
I would modify in the Davis case to reduce the conviction to murder in the second degree on the ground that defendant’s guilt of murder *39 in the first degree has not been established in law and in fact beyond a reasonable doubt. Consequently, it is not, in the Davis case, necessary or appropriate to reach any constitutional issue concerning New York’s capital punishment statute. I would affirm in the James case on the ground that his guilt of murder in the first degree has been established beyond a reasonable doubt and that the New York statute appears to meet the latest tests for validity laid down by the United States Supreme Court.
The constitutional issue before the court is, as the majority opinion observes, not to be determined by the philosophical or penological predilections of the court or its individual members on the appropriateness of capital punishment as a sanction in a civilized society. Instead, the issue is whether Federal constitutional limitations allow the Legislature as the lawmaking representatives of the people to determine the values and judgments to be attached to the several factors influencing the choice of capital punishment as a sanction.*
Davis and James, defendants in unrelated criminal cases, each convicted of first degree murder and sentenced to death, appeal directly to this court (NY Const, art VI, § 3, subd b; CPL 450.70). One intentionally killed a police officer. The other intentionally killed a correction officer.
There are two issues. The first, given this court’s power to review the facts in a capital case, is whether, in each case, the evidence justifies the jury’s verdict (NY Const, art VI, § 3, *40 subd. a; CPL 470.30, subd 1). The second is whether section 60.06 of the Penal Law, providing capital punishment for first degree murder, an offense defined in narrow terms (Penal Law, § 125.27), violates Federal constitutional proscriptions of cruel and unusual punishment (US Const, 8th Arndt; see, also, NY Const, art I, § 5).
The evidence in the Davis case failed to establish beyond a reasonable doubt that the police officer killed was acting in the line of duty at the time he was shot. Hence, the crime of first degree murder was not made out and there should be a modification.
The judgment against defendant James should be affirmed. In his case, every element of first degree murder was established beyond a reasonable doubt. Because the New York statute defining first degree murder is so narrowly drawn, and because the statutory scheme takes into consideration possible mitigating factors by making them defenses to the substantive crime, it does not run afoul of constitutional limitations.
On September 17, 1974, Davis participated in an armed robbery of a supermarket. While his collaborator filled a canvas bag with money in excess of $5,000, Davis stood watch, relatively inconspicuously, just inside the exit door. Police Officer Woods, not in uniform, but about to report for work, had just paid for his purchases, apparently unaware of the ongoing robbery. As Woods attempted to leave the store, he was shoved by Davis and ordered to "get back in the store.” Recovering and starting out for a second time, he was again repulsed. Angrily, according to one witness, he exclaimed, "What are you doing. I’m a cop.” Davis responded with a statement, "You’re a cop, huh”, and a bullet, which felled Officer Woods. This exchange was corroborated by other witnesses. Davis and his cohort emptied another cash register, ordered everyone to the back, and left. Officer Woods, having suffered a severed spinal cord, died five days later of broncho-pneumonia.
At trial, the proof of Davis’ guilt was overwhelming. Six witnesses placed him at the scene; four of these witnessed the killing and identified Davis as the killer. In addition, an FBI informer testified to admissions made to him by defendant. The defense sought to place Davis in New Orleans at the time of the shooting, but his alibi witnesses failed to contradict convincingly the strong evidence presented by the prosecution.
*41 Thus, the evidence leads, inexorably, to the conclusion that Davis intentionally killed Officer Woods.
There is no doubt whatever that appellant James is guilty of the killing of Correction Officer Motchan. For almost two months, James, jailed on a pending murder charge, with an impending probability of a life sentence, discussed his escape with a girl friend, Patricia Singleton, during daily telephone conversations. Then on September 7, 1975, on defendant’s request, the girl friend procured a gun. After receiving further instructions from defendant on the morning of September 9, Miss Singleton left the gun in the lavatory in the Kings County Hospital Dental Clinic, where James had an appointment that day.
James was escorted to the clinic by two correction officers, Motchan and Connor. When defendant asked to use the lavatory, Officer Motchan, unarmed, accompanied him, while Officer Connor waited outside the door. After some scuffling in the lavatory, Officer Motchan emerged, without being able to close the door behind him, warning Connor that appellant had a gun. A shot from the lavatory hit Motchan in the back, mortally wounding him, and James, in the course of his escape, also wounded Officer Connor and an innocent bystander in the now-panicked waiting area.
James contended that the undisputed shooting was an "accident”, caused by Motchan’s stumbling as he left the lavatory. But the testimony of eyewitnesses does not support this contention, and defendant’s continued shooting at other bystanders belies it. And if more' be needed, there is defendant’s desperate letter to a former girl friend, sent days before the attempted escape: "Listen, Debbie, I am very serious about what I am about to say. I am going to have an interview this week. I’m getting out of here or die trying. And if I die trying, you know me, that I am going to take someone with me”.
Although it is beyond reasonable doubt that each appellant intentionally caused the death of his victim, in the Davis case, a police officer, and in the James case, a correction officer, that alone is not enough to establish a violation of section 125.27 of the Penal Law. The restricted scope of that section requires that the officer be "killed in the course of performing his official duties” (subd 1, par [a], els [i], [ii]). As to this element, there was a failure of proof in the Davis case. True, decedent Woods announced "I’m a cop”, provoking Davis to shoot him. But from those words alone, one may not draw *42 beyond a reasonable doubt the inference that Woods was acting in the line of duty. And there is no more. Woods might have uttered the words expecting only to induce Davis into moving aside and letting him continue on his way. Other likely explanations exist. The point is not that these inferences are any better than the one drawn by the prosecution; the point is rather that there is not evidence beyond a reasonable doubt to support any one inference more than another arising out of Woods’ utterance. The result is that one may only speculate about the decedent’s state of mind and his intentions. Davis’ conviction must, therefore, be reduced to one for murder in the second degree.
The James case, by contrast, falls squarely within the proscription of the statute (Penal Law, § 125.27). What remains to be addressed is only the constitutional challenge to the statute mandating a sentence of death (Penal Law, § 60.06).
Section 125.27 of the Penal Law, defining first degree murder, is applicable only to three categories of intentional killing. The first two cover killings of police officers and correctional employees in the course of performing their duties, where defendant knew or reasonably should have known that the victim was a police officer or correctional employee (subd 1, par [a], els [i], [ii]). The third category applies to defendants who were life prisoners or escaped life prisoners (cl [iii]). There are, significantly, two ameliorative provisions in the statute. First, a defendant may not be convicted of first degree murder unless he is at least 18 years of age (subd 1, par [b]). Second, it is a defense in a prosecution for first degree murder that defendant acted under the influence of extreme emotional disturbance (subd 2, par [a]).
It is now settled, for the nonce, at least, that capital punishment, per se, does not violate Federal constitutional prohibitions of cruel and unusual punishment (Gregg v Georgia, 428 US 153, 168-187; Proffitt v Florida, 428 US 242, 247; Jurek v Texas, 428 US 262, 268). Although the Supreme Court has held invalid mandatory capital punishment statutes covering a wide range of offenses, it has never been held that all mandatory capital punishment statutes are necessarily inconsistent with the Constitution (see Roberts [Harry] v Louisiana, 431 US 633; Roberts [Stanislaus] v Louisiana, 428 US 325; Woodson v North Carolina, 428 US 280). In fact, it has been noted, explicitly, that mandatory capital punishment *43 statutes applied to assaults or murders committed by prisoners serving life sentences might well pass constitutional muster (Roberts [Harry] v Louisiana, 413 US 633, 637, n 5, supra; Roberts [Stanislaus] v Louisiana, 428 US 325, 334, n 9, supra; see Gregg v Georgia, 428 US 153, 186, supra; Woodson v North Carolina, 428 US 280, 292, n 25, supra).
The life prisoner presents a special case, according to the Supreme Court, because there may be no satisfactory deterrent other than the death penalty. But the court did not hold that only in the case of a life prisoner may a mandatory capital punishment statute be applied. Only a weak imagination would fail to perceive other cases just as special as that of the life prisoner. For instance, belief that a soldier is frightened of death and considering desertion in time of war may justify the threat of capital punishment to keep him at his station. And, of course, a prisoner like appellant James in the instant case, not yet sentenced to life imprisonment, but facing a murder charge which could well bring upon him such a sentence, presents a case no different from that of the life prisoner. Nor would the killing of a victim of or witness to a crime punishable by life imprisonment, to prevent successful identification and prosecution for the first crime, be of a different nature.
The Supreme Court has recognized, then, that mandatory capital punishment statutes applicable only in very special cases may not run afoul of constitutional limitations. It is not, however, necessary to decide whether all the categories of section 125.27 of the Penal Law constitute "special” cases, because the New York statute is not truly a "mandatory” capital punishment statute, as that term has been used by the Supreme Court.
Crucial are the statutory defense of extreme emotional disturbance and the limitation on conviction of first degree murder to persons more than 18 years old. These mitigating circumstances are precisely the kind of factors, specific to the offense or the offender, which the Supreme Court has required to sustain capital punishment statutes (see, e.g., Gregg v Georgia, 428 US 153, 193-195, n 44, supra). In fact, of the eight mitigating circumstances proposed by the Model Penal Code, and cited in Gregg, six are, in some manner, reflected in the New York statutory scheme: (1) extreme emotional disturbance is a defense to murder (Penal Law, § 125.27, subd 2, par [a]); (2) conduct causing or aiding another to commit suicide *44 may not bring a conviction for murder (Penal Law, § 125.27, subd 2, par [b]); (3) justification for the killing is a defense (Penal Law, art 35); (4) duress is a defense (Penal Law, § 40.00); (5) lack of capacity by reason of mental disease or defect is a defense (Penal Law, § 30.05), and intoxication may negative the intent to commit first degree murder (Penal Law, § 15.25; People v Koerber, 244 NY 147, 151-152; see People v Jackson, 14 NY2d 5, 7-8); and (6) only those over 18 years of age at the time the crime was committed may be convicted of first degree murder (Penal Law, § 125.27, subd 1, par [b]). (See Gregg v Georgia, 428 US 153, 193-194, n 44, supra, quoting ALI Model Penal Code, § 210.6 [Proposed Official Draft, 1962].)
It is notable that these are factors that the Supreme Court in the Roberts (Harry) case (431 US 633, 636-637, supra), relied on and quoted by the majority, stipulated as bearing upon the validity of a capital punishment statute. New York’s statutory scheme is even better in raising these factors to complete or partial defenses.
True, other capital punishment statutes sustained by the Supreme Court have provided for consideration of mitigating factors after the jury has convicted defendant of the substantive offense (Gregg v Georgia, 428 US 153, 196-198, supra; Proffitt v Florida, 428 US 242, 247-253; supra; Jurek v Texas, 428 US 262, 268-274, supra). But there is no reason to assume that mitigating factors could not, instead, and even preferably, be built into the definition of the substantive offense. Indeed, the Supreme Court itself used similar analysis in Jurek v Texas, indicating that narrowing the categories of murders for which capital punishment may be imposed serves much the same function as listing aggravating factors for the jury to consider (supra, p 270). The situation is analogous where mitigating factors are involved. Certainly, if every possible mitigating factor were made a defense to the substantive crime, there would be little reason for the jury to consider mitigating factors in making a discretionary sentencing determination.
Section 125.27 of the Penal Law does not, of course, encompass every conceivable mitigating circumstance. But the Constitution does not require so much. It is essential only "that the capital-sentencing decision allow for consideration of whatever mitigating circumstances may be relevant to either the particular offender or the particular offense” (Roberts [Harry] v Louisiana, 431 US 633, 637, supra).
*45 Determining what circumstances are "relevant” must be a legislative, not judicial, task, at least once it has been determined that the Legislature has in fact decided to consider mitigating factors.
Nor in justice to the Supreme Court should it be assumed that that court would harden for all time under constitutional standards all conceivable categories of mitigating circumstances or that all must be accorded recognition, or that the procedure for their recognition must follow a particular pattern laid down by the court. It has had much too much trouble with this very problem not to be more flexible. The very caveats and provisos in its most recent opinions make this point explicit so that it is not necessary to have recourse to inference. Moreover, that court addresses constitutional principles and does not purport to write or dictate a statutory criminal code.
To recapitulate, it has never been held that all mandatory capital punishment statutes violate the cruel and unusual punishment clause of the Constitution. At least in a narrowly drawn category of special cases, a category which may be broad enough to include the entire New York statute, failure to provide for consideration of mitigating factors does not make a capital punishment statute constitutionally defective. But, in any event, the New York statute, although written in mandatory terms, is not embracively mandatory in that it does not encompass, indiscriminately and without consideration of mitigating factors, a mass aggregation of crimes. Thus, since section 125.27 of the Penal Law does require the jury to consider mitigating factors as elements of the substantive crime of first degree murder, there is no constitutional violation.
That the Constitution plays an important role in limiting the scope of capital punishment statutes is not now a matter of controversy. Unbridled jury discretion, because of possible discriminatory effects, must not be an element of the sentencing process in capital cases (Furman v Georgia, 408 US 238, reh den 409 US 902). At the opposite end of the spectrum, statutes which require mechanical application of the death penalty without any consideration of circumstances surrounding the crime and the criminal, are also unconstitutional (Roberts [Harry] v Louisiana, 431 US 633, 637, supra; Roberts [Stanislaus] v Louisiana, 428 US 325, 333, supra; Woodson v North Carolina, 428 US 280, 304, supra).
*46 But within the constitutional limitations, the decision to impose capital punishment at all, as well as the decision when it should be imposed, remains within the province of the Legislature. True, it has never been established that capital punishment is an effective deterrent. But there may be other reasons, unrelated to utilitarian considerations, to justify the death penalty. Whatever one thinks of capital punishment, the Legislature is entitled to conclude, rightly or wrongly, that the death penalty serves useful social purposes. Since the Legislature has so concluded, and has drawn a statute that comports with constitutional requirements, the statute should be upheld.
The ultimate issue is whether society through its Legislature or lawmaking body may determine the usefulness of capital punishment or whether Judges are empowered to do so, recognizing that capital punishment has been a sanction throughout the history of Anglo-American law. Progressively, lawmaking bodies have restricted more and more the use of that sanction. Rarely, although on occasion, has the sanction been reinvoked. England treated the matter legislatively and eliminated the sanction for murder (Murder [Abolition of Death Penalty] Act, 1965, c 71, as amd by Statute Law [Repeals] Act, 1973, and Statute Law [Repeals] Act, 1974). Many States of the Union have abolished capital punishment. The Supreme Court, both in Furman, and in subsequent cases, has never presumed to strike down the sanction as inherently invalid. It has only attacked the procedures used which allowed arbitrariness or compelled mechanical absolutist application across a broad range of homicide offenses. Nor has it ever presumed, in this troubled area, to deny the power of the Legislature to rely on the extreme sanction. Its greatest concern has been the racial discrimination which resulted from the arbitrariness allowed fact finders and sentencing courts under the old procedures (see Furman v Georgia, 408 US 238, supra). In the later cases it reacted to the brutality and undiscriminating mechanical application of the "absolutist” cure to the risk of arbitrariness in the "discretionary” procedures which had prevailed before (see Woodson v North Carolina, 428 US 280, supra; Roberts [Stanislaus] v Louisiana, 428 US 325, supra; Roberts [Harry] v Louisiana, 431 US 633, supra). These are the concerns which motivated the Supreme Court’s treatment of the problem.
Accordingly, I dissent in part and vote to reduce the judg *47 ment against appellant Davis to a conviction of second degree murder, and to remit the case for resentencing, and to affirm the judgment against appellant James.
Judges Jones, Wachtler and Fuchsberg concur with Judge Cooke; Chief Judge Breitel concurs in a separate opinion in which Judges Jasen and Gabrielli concur.
In People v Davis: Judgment modified and the case remitted to Supreme Court, Westchester County, for resentencing in accordance with the opinion herein and, as so modified, affirmed.
Judges Jones, Wachtler and Fuchsberg concur with Judge Cooke; Chief Judge Breitel dissents and votes to affirm in a separate opinion in which Judges Jasen and Gabrielli concur.
In People v James: Judgment modified and the case remitted to Supreme Court, Kings County, for resentencing in accordance with the opinion herein and, as so modified, affirmed.

 Speaking for myself alone among the dissenters I find capital punishment repulsive, unproven to be an effective deterrent (of which the James case itself is illustrative), unworthy of a civilized society (except perhaps for deserters in time of war) because of the occasion of mistakes and changes in social values as to what are mitigating circumstances, and the brutalizing of all those who participate directly or indirectly in its infliction. This has been a lifelong view buttressed by over 40 years of experience as prosecutor, counsel to the Governor entailing 81 applications for commutation of capital sentences, Judge, member of the "National Crime Commission”, witness before the British Royal Commission on Capital Punishment, and member of the American Law Institute and its Advisory Committee on the Model Penal Code. In all of these roles, when appropriate, I actively resisted viewing capital punishment as a proper or useful sanction for civilian crime. (With respect to the dubiousness of capital punishment as a deterrent, see Royal Commission on Capital Punishment, 1949-1953 Report, pp 18, 328-380; Sellin, The Death Penalty [1959], pp 19-63; President’s Commission on Law Enforcement and Administration of Justice, Challenge of Crime in a Free Society, p 143; Model Penal Code, § 201.6, Comment [Tent Draft No. 9, 1959]; Temporary Commission on Revision of Penal Law and Criminal Code, Special Report on Capital Punishment [1965], pp 86-94, in NY Legis Doc, 1965, No. 25; Forst, Deterrent Effect of Capital Punishment: A Cross-State Analysis of the 1960’s, 61 Minn L Rev 743).