**Raymond Wallace SHUMAN, Petitioner,**

v.

**Charles L. WOLFF, Jr., et al., Respondents.**

**Nos. CV–R–78–118–ECR, CV–R–78–119–ECR.**

United States District Court, D. Nevada.

Aug. 17, 1983.

See also, D.C., 543 F.Supp. 104.

Douglas G. Lohse, Reno, Nev., amicus curiae.

William N. Dunseath, Federal Public Defender, Reno, Nev., for petitioner.

Richard H. Bryan, Atty. Gen., Carson City, Nev., for respondents.

### ORDER

EDWARD C. REED, Jr., District Judge.

Pursuant to the Court's order entered herein on March 23, 1983, and the subse-

quent evidentiary hearing held on July 8, 1983, the Court now renders its ruling on the remaining claims in this action.

With regard to petitioner's conviction for first degree murder in 1958, it is asserted that the confession of his codefendant was improperly admitted in violation of the rule of *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), which is applied retroactively. *Roberts v. Russell,* 392 U.S. 293, 88 S.Ct. 1921, 20 L.Ed.2d 1100 (1968). The Court now further considers its earlier denial of this claim in its order of March 23, 1983.

A complete transcript of the petitioner's 1958 trial is not available for this Court to review.

However, a partial transcript of that trial is available, as are the Court Clerk's minutes and a list of exhibits admitted in behalf of the state. The record also includes transcribed copies of the confession of the petitioner and the confession of his former codefendant, Marvin Lee Rowland. The records available indicate that these confessions were both admitted at trial subject to court ordered excisions of certain portions thereof. The face of the petition also confirms the admission of the confessions of petitioner and his codefendant.

The petitioner's confession was given by him on two consecutive days, December 20 and December 21 of 1957, at Hawthorne, Nevada. Transcribed, it totals some ninety pages and, even with the excisions made, furnishes a detailed and complete account of the murder of which petitioner was convicted at his 1958 trial. The confession of Marvin Lee Rowland, although not quite as detailed as petitioner's confession, and even with excisions made in it, also gives a complete account of the same murder. Both confessions as received in evidence are in agreement with one another and interlock. There are no material conflicts between the two as to any element of the murder. It is readily apparent from a reading of petitioner's confession that that confession alone provided more than a sufficient basis for his conviction.

Shortly after *Bruton, supra,* was decided, the Supreme Court rejected the contention that the erroneous admission at a joint trial of evidence such as was introduced in the *Bruton* trial automatically requires reversal of an otherwise valid conviction. *Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969).

It is important to remember that the confession at issue in *Bruton* inculpated a nonconfessing defendant. The Supreme Court explained the impact of *Bruton* on cases in which both or all defendants confess in *Parker v. Randolph,* 442 U.S. 62, 99 S.Ct. 2132, 60 L.Ed.2d 713 (1979). The Court stated:

> "The prejudicial impact of a codefendant's confession upon an incriminated defendant who has, insofar as the jury is concerned, maintained his innocence from the beginning is simply too great in such cases to be cured by a limiting instruction. The same cannot be said, however, when the defendant's own confession— 'probably the most probative and damaging evidence that can be admitted against him,' *id.,* at 139 [88 S.Ct., at 1630] (White, J., dissenting)—is properly introduced at trial. The defendant is 'the most knowledgeable and unimpeachable source of information about his past conduct,' *id.,* at 140 [88 S.Ct., at 1630] (White, J., dissenting), and one can scarcely imagine evidence more damaging to his defense than his own admission of guilt. Thus, the incriminating statements of a codefendant will seldom, if ever, be of the 'devastating' character referred to in *Bruton* when the incriminated defendant has admitted his own guilt." 442 U.S. at 72, 73, 99 S.Ct. at 2138, 2139.

The petitioner's statements and admissions which were introduced against him at the 1958 trial constituted a complete confession. They described all the elements of the crime with which he was charged and did so in considerable detail. They correlated with the circumstantial evidence and were damaging in the extreme. So damaging in fact that it is difficult, if not impossible, to conjecture that any statements made

by petitioner's codefendant could have made any difference in the outcome of the trial with regard to petitioner.

█ Although a complete record of the 1958 trial is lacking, it is apparent from reading petitioner's confession that a *Bruton* issue did not arise in favor of the defendant as a result of the introduction of the confession of Marvin Lee Rowland. Given the interlocking character of the confession of Mr. Rowland and petitioner's confession and the comprehensive and detailed nature of petitioner's confession it is clear beyond a reasonable doubt that the introduction of Mr. Rowland's confession constituted harmless error relative to petitioner.

Respondents argue that the absence of a complete transcript of the trial prejudices their ability to defend against the claim of *Bruton* error, i.e., to defend on the basis that even if such error may have occurred it was "harmless beyond a reasonable doubt." *United States v. Espericueta-Reyes*, 631 F.2d 616, 624 (9th Cir.1980); *Felton v. Harris*, 482 F.Supp. 448, 456 (S.D.N.Y.1979). Respondents contend that further consideration of possible *Bruton* error should be barred because of the prejudice resulting to respondents due to the nearly twenty-year delay in bringing this issue before the Court. This argument is well taken.

Under Rule 9(a) of the Rules Governing Section 2254 cases in the United States District Court, a § 2254 petition may be barred where the respondents can show that they have been prejudiced by the delay in their ability to respond "unless the petitioner shows that it is based upon grounds of which he could not have had knowledge by the exercise of reasonable diligence before the circumstances prejudicial to the state occurred." At the evidentiary hearing held herein on July 8, 1983, it was shown that only a limited portion of the trial transcript is now available or can be obtained. This renders it virtually impossible for the respondents to show that any *Bruton* violation which may have occurred during the trial was "harmless beyond a reasonable doubt." If a complete record of the 1958 trial did exist, there is reason to

believe that respondents could make a showing to support such a finding. It appears that, in addition to the defendant's own confession, very substantial evidence of the guilt of defendant independent of the codefendant's confessions was adduced at trial, but that no transcript of that evidence can now be obtained.

█ Under these circumstances, where the sole apparent motivation for the filing of a petition for habeas corpus challenging the 1958 conviction for first degree murder is the subsequent conviction for first degree murder in 1975, the Court cannot find as a matter of law that petitioner has exercised due diligence in bringing this claim before the Court.

Petitioner has also presented several grounds in relation to the death penalty imposed after he was found guilty of first degree murder at the 1975 trial. First, petitioner contends that the statute under which he was sentenced was arbitrary in that it mandated the death penalty for persons who are serving prison terms of life without possibility of parole. He asserts that automatically sentencing such persons who commit murder to death is irrational and that no evidence exists to support its deterrent purpose.

Petitioner also urges that Nevada's appellate review of death penalty cases is constitutionally deficient under *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) and its progeny.

Finally, petitioner urges the Court to find that capital punishment by death in a gas chamber constitutes cruel and unusual punishment under the Eighth Amendment and that the death penalty *per se* is excessive.

Any reasonable reading of the cases following *Furman v. Georgia, supra,* especially *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) makes it clear that the Supreme Court does not consider the imposition of the death penalty to *per se* constitute a violation of the prohibition against cruel and unusual punishment under the Eighth and Fourteenth Amendments. Rather, beginning with *Furman* the

Supreme Court has attempted to provide "standards for a constitutional death penalty that would serve both goals of measured, consistent application and fairness to the accused." *Eddings v. Oklahoma,* 455 U.S. 104, 111, 102 S.Ct. 869, 874, 71 L.Ed.2d 1 (1982). The danger to be avoided is the substantial risk that the death penalty be imposed in an arbitrary and capricious fashion.

Following the *Furman* decision many states, including Nevada, enacted statutes making the death penalty mandatory for certain offenses as a response to the perceived fatal flaw in the Georgia statute held unconstitutional in *Furman,* that of conferring too much discretion in the sentencing authority. Beginning in 1976 the Supreme Court has held such mandatory statutes unconstitutional on several occasions because, as explained in the plurality opinion in *Woodson v. North Carolina,* 428 U.S. 280, 303, 96 S.Ct. 2978, 2990, 49 L.Ed.2d 944 (1976), the procedure used in imposing the penalty of death failed to consider the character and record of the individual offender together with the circumstances of the particular offense. *Washington v. Louisiana,* 428 U.S. 906, 96 S.Ct. 3214, 49 L.Ed.2d 1213 (1976); *Roberts v. Louisiana,* 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976); *Roberts H. v. Louisiana,* 431 U.S. 633, 97 S.Ct. 1993, 52 L.Ed.2d 637 (1977); *Sparks v. North Carolina,* 428 U.S. 905, 96 S.Ct. 3213, 49 L.Ed.2d 1212 (1976).

The question now before the Court, however, is one which the Supreme Court has expressly reserved in several cases. *Roberts v. Louisiana, supra,* 431 U.S. at 637 n. 5, 97 S.Ct. at 1995 n. 5; *Woodson v. North Carolina, supra,* 428 U.S. at pp. 292–93 n. 25, 96 S.Ct. at p. 2985 n. 25; *Lockett v. Ohio,* 438 U.S. 586, 602 n. 11, 98 S.Ct. 2954, 2964 n. 11, 57 L.Ed.2d 973 (1978). That is whether a mandatory death penalty may be justified in the case of the prisoner serving a life sentence. As stated in the court's plurality opinion in *Roberts H. v. Louisiana, supra,* 428 U.S. 325, 334 n. 9, 96 S.Ct. 3001, 3006 n. 9, 49 L.Ed.2d 974:

"Only the third category of the Louisiana first-degree murder statute, covering intentional killing by a person serving a life sentence or by a person previously convicted of an unrelated murder, defines the capital crime at least in significant part in terms of the character or record of the individual offender. Although even this narrow category does not permit the jury to consider possible mitigating factors, a prisoner serving a life sentence presents a unique problem that may justify such a law."

■ In *Eddings v. Oklahoma, supra,* the Supreme Court for the first time since the confusion following that body's brief, cursory per curiam order in *Furman* presented an opinion joined by a majority of the court. There the following rule first presented in *Lockett v. Ohio, supra,* 438 U.S. at 604, 98 S.Ct. at 2964 was embraced:

"[W]e conclude that the Eighth and Fourteenth Amendments require that the sentencer ... not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." 455 U.S. at 110, 102 S.Ct. at 874. (Emphasis in original.)

Application of this rule to petitioner's penalty of death imposed in 1975 necessitates vacating his death sentence since it was imposed under Nevada's since abandoned mandatory death penalty statute. In 1977 Nevada enacted legislation which in essence adopts the commonly used bifurcated procedure in death penalty cases whereby the guilt and punishment phases of the case are separated and evidence regarding both aggravating and mitigating circumstances can be presented for consideration by the sentencing authorities. NRS 175.552, 175.558.

The lack of any other reasonable means of deterring a prisoner who is serving a sentence of life without possibility of parole for murder from killing again is the primary basis offered in support of the constitutionality of petitioner's mandatory death sentence. It is the view of this Court that a

mandatory death sentence for the prisoner serving a life term who kills is not necessarily the only way to deter such a person from killing again. That is, imposition of the death penalty on a person in the position of petitioner pursuant to the bifurcated procedure currently in effect in Nevada, for instance, still allows the death penalty to be given in an appropriate case while also providing for the prisoner-defendant to present possible mitigating factors.

This presupposes, of course, that mitigating factors may be present in the case of the life term prisoner who stands convicted of first degree murder. As to defendants in general facing the death penalty and as recognized in *Richmond v. Cardwell,* 450 F.Supp. 519 (D.Ariz.1978):

> "The United States Supreme Court has repeatedly suggested those factors which focus on the characteristics of the person who committed the crime and which should be considered in mitigation before imposition of the death penalty. Included are ·such factors as "Does he have a record of prior convictions for capital offenses? Are there any special facts about this defendant that mitigate against imposing capital punishment (e.g., his youth, the extent of his cooperation with the police, his emotional state at the time of the crime)." 450 F.Supp. at 523

The fact that the prisoner-defendant has been previously convicted of murder and is serving a life term at the time of the second conviction is but one, albeit strong and important, aggravating factor which should be considered in passing sentence. Yet another mitigating factor which may be considered in this regard is "whether the defendant was under an extreme form of mental or emotional pressure, something less, perhaps, than insanity, but more than the emotions of the average man, however inflamed, could withstand." *Granviel v. Estelle,* 655 F.2d 673, 675 (5th Cir.1981) quoting from *Jurek v. State,* 522 S.W.2d 934, 939–40, aff'd *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 ·L.Ed.2d 929 (1976).

Imposing mandatory capital punishment for the life term prisoner who intentionally kills is to consider but one aspect of the character and record of the individual while ignoring totally the circumstances of the crime for which he is being sentenced. The availability of the death penalty for the prisoner serving a life term without possibility of parole· is a sufficient deterrent, while making mandatory such a sentence under those circumstances only serves to give the imposition of the death sentence the air of arbitrariness and caprice.

The Supreme Court's disdain for mandatory capital punishment was made clear by the majority opinion in *Eddings v. Oklahoma, supra,* 455 U.S. at 111–112, 102 S.Ct. at 874–875, where, drawing upon its less unified precedents the court found:

> Similarly, in *Woodson v. North Carolina,* 428 U.S. 280 [96 S.Ct. 2978, 49 L.Ed.2d 944] (1976), the plurality held that mandatory death sentencing was not a permissible response to the problem of arbitrary jury discretion. As the history of capital punishment had shown, such an approach to the problem of discretion could not succeed while the Eighth Amendment required that the individual be given his due: "the fundamental respect for humanity underlying the Eighth Amendment ... requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." *Id.,* at 304, 96 S.Ct., at 2991. *See Roberts (Harry) v. Louisiana,* 431 U.S. 633, 97 S.Ct. 1993, 52 L.Ed.2d 637 (1977); *Roberts (Stanislaus) v. Louisiana,* 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976).

In again drawing from its earlier death penalty cases the court in *Eddings* affirms the underlying insistence that "capital punishment be imposed fairly, and with reasonable consistency, or not at all." 455 U.S. at 112, 102 S.Ct. at 875. A rule which provides mandatory capital punishment for one class of persons but requires individualized consideration of circumstances before deciding whether or not to impose· capital punish-

ment in the cases of all others does not constitute reasonable consistency.

The Court concludes that NRS 200.-030(1)(b) in effect at the time petitioner was convicted of first degree murder and subsequently sentenced to death in 1975 violates the Eighth and Fourteenth Amendments of the United States Constitution.

IT IS HEREBY ORDERED that the sentence of Raymond Wallace Shuman, in Case No. 33,259, *State of Nevada v. Raymond Wallace Shuman,* in the First Judicial District Court of the State of Nevada, in and for Carson City, be, and the same is hereby, vacated and set aside.

IT IS FURTHER ORDERED that said Raymond Wallace Shuman be discharged and released from confinement on account of the sentence pronounced in said Case No. 33,259 unless the State, within one hundred twenty (120) days from the date of this Order initiates and completes lawful resentencing proceedings in accordance with this Order.